**DIAMOND INTERNATIONAL CORPO-RATION, a corporation of Delaware**

v.

**Harry C. WALTERHOEFER, Jr., William C. Walterhoefer and John A. Walterhoefer, trading as Harry C. Walterhoefer & Sons, and Packaging Corporation of America.**

Civ. A. No. 14510.

United States District Court
D. Maryland.

July 26, 1968.

As Amended Oct. 21, 1968.

John W. Avirett, 2d, Piper & Marbury, Baltimore, Md., Karl W. Flocks, Sheridan Neimark, Washington, D. C., Sumner S. Kittelle, Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, for plaintiff.

John Henry Lewin, Venable, Baetjer & Howard, Baltimore, Md., Arthur A. Olson, Jr., James R. Dowdall, and Thorley Von Holst, Pendleton, Neuman, Seibold & Williams, Chicago, Ill., for defendants.

R. DORSEY WATKINS, District Judge.

This is an action brought by Diamond International Corporation (by change of name from Diamond National Corporation, assignee of the patent in suit, and hereinafter sometimes "plaintiff") against Harry C. Walterhoefer, Jr., William C. Walterhoefer, and John A. Walterhoefer, trading as Harry C. Walterhoefer & Sons (distributors) and Packaging Corporation of America (manufacturer), hereinafter defendants or PCA, for alleged infringement of United States Patent 2,990,094 (Reifers '094) issued June 27, 1961, on a continuation of a copending application filed December 16, 1953, which in turn was

a continuation-in-part of an application filed May 24, 1952, and abandoned, for a "Molded Pulp Egg Carton." The patent in question is a product patent.

The progress of the various patent applications was tortuous and protracted, and the patent was allowed only after the Board of Appeals had overruled the disallowance by the Examiner of Claim 23 (later Claim 25, and Claim 1 of the patent as issued). The procedure in this court might be similarly characterized.[1]

Nor has PCA been niggardly in its defenses as to validity, infringement and enforceability. It asserts invalidity under 35 U.S.C. sections 101, 102, 103 and 112; absence of invention because of contemporaneous development of a similar locking device; misrepresentations to the Patent Office and to the Board of Appeals; file wrapper estoppel; abandonment at time of public use; violation of section 2 of the Sherman Act by fraudulently obtaining the patent in suit and an attempt thereby to obtain power to exclude competition; and an attempt to monopolize a distinct relevant market in molded pulp egg cartons.

Defendants also filed a counterclaim for a declaration of invalidity and non-infringement; and after the decision in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 1965, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, filed an amended counterclaim adding two paragraphs to their original counterclaim and seeking therein a dismissal of the principal suit on grounds of unenforceability of the patent because of unclean hands and patent misuse, including violation of section 2 of the Sherman Act.

### Background.

Whatever may be the correct answer to the question of "which came first, the chicken or the egg?", at all times relevant herein, there were millions of hens, and millions of dozens of eggs. The practical question was: "How can these eggs be commercially transported, either to their ultimate destination, or to points of distribution?"

The chief commercial containers for the transportation of eggs were either paperboard (cardboard) or molded pulp containers or separators in which some thirty dozen eggs would be packed in a single container, separated by "egg flats" and egg "filler flats." Then began the manufacture of egg cartons, in which a dozen eggs would be placed in a container, packed thirty cartons to a container. The competition between paperboard cartons and molded pulp cartons was, and continued to be, severe, their sales being split roughly 50-50 as of the time of trial. Each needed to be automatable as to loading. Each had certain advantages and disadvantages. The paperboard carton would better accept ink and advertising material; it could be closed by staple, glue or cord; but it did not accord maximum protection to the eggs, and was not readily adapted to re-use. The molded pulp carton was much more readily susceptible to cell formation designed to support and protect the eggs, but it was relatively brittle, and presented problems of closure similar to the paperboard cartons. Flaps or lugs were difficult to automate, and tended to break or bulge. In general, no satisfactory automatable locking had been developed prior to Reifers '094 in a molded pulp carton.

In several instances a compromise had been sought to be effected, a molded carton being placed in a paperboard "sleeve" or container. Moreover, "tri-fold" molded cartons had been developed, in which a flange connected to the cover portion contained extensions to be inserted in

---

1. Pre-pretrial conferences; pretrial conferences and orders; a trial of twenty-one court days and two days of oral arguments; a transcript of 3,222 pages with 273 plaintiff's exhibits and 249 defendants' exhibits and trial briefs of over 675 pages (taking only "Foreword" and text). If the instances in which a numbered page is faced by an unnumbered page, and if the appendice's pages, were added the number would well exceed 800.

apertures in the tray portions of the containers.

In general, locking devices for molded pulp cartons had proceeded on the basis of frictional closure by placing a flap between the lower container, or tray portion, of the carton and the contained eggs, the eggs together with the spring action of the flap being relied upon to cause a locking; or tabs,[2] usually in the upper, or cover, portion of the carton were inserted in slots or openings in the front of the tray portion. Some suggestions had occurred in paper patents that the lugs could be placed on a flanged portion attached to the tray and inserted into the cover portion. Variations as to whether the cover portion should be cellular or non-cellular (planar) also existed.

At the time the Reifers alleged invention was conceived, the most nearly commercially satisfactory molded carton was one which combined the physical structure of Cox Patent 2,771,233, issued November 20, 1956 on an application filed June 21, 1950, with the Sherman "Tab-Lock", Patent 2,587,909, issued on March 4, 1952 on application filed February 17, 1947. Cox '233 contained quite satisfactory egg cell formations in the tray, to which a flange was attached, and a non-cellular cover, with a flexible front side. The Sherman tab-lock had a tab-receiving opening between the cells in the bottom (tray) section, and an extension from the cover section with a locking tab for insertion into the opening in the bottom section.

Efforts to secure effective locking devices in molded pulp cartons had been the subject of numerous efforts by many inventors, including Cox, president of plaintiff, and others, to be mentioned in specific discussion of the prior art.

Where a tab or lug device, as distinguished from a frictional one (or adhesives, or staples, or string) was relied upon, in general the male member was on the cover, or a flange thereof, and the female member was in the tray. In these, and in the few instances in which the flange and male member were attached to the tray, and the female member was in the cover, the entry was *always* directed from the outside in.

When Reifers was employed by plaintiff, he was given two assignments, one of which was to design a satisfactory lock for a molded pulp egg carton. He had had no experience in the field of egg cartons, but had shown substantial ingenuity in the field of packaging containers. Without study of the prior art, but with a background of extensive practical experience in packaging, in about five months [3] he developed the product on which the patent in suit issued. His testimony as to the production of a working model, its disclosure and recordation of invention, is in the Court's opinion entirely satisfactorily supported by the evidence.

In substance, he took the Cox '233 patent, placed the male members (nobs, or lugs) on the flange hinged to the tray, the thrust of said male members being directed from the inside out, and inserted receiving notches (holes, female members) in the front wall of the cover portion. This permitted easy filling, by having the tray portion completely open, with the flange extended outwardly, and an easy closing by then pressing in the flange and rotating the cover over it. Upon release, the flange would spring outwardly, securely locking the cover; protecting the eggs; permitting release of the cover without harming the eggs, and also the opening, removal of some of the eggs, and manual reclosing. Simple—beautifully simple; and so obvious in the view of 20-20 hindsight vision;

2. The tabs were referred to as the "male" members, and the slots or apertures as the "female" members.

3. Whether Reifers is an illustration of "the new broom sweeps clean" is an interesting, but not critical question. It may well be that, freed from the (unsuccessful) teachings of the "art", theoretical, paper and practical, he saw what was obscured by the generally accepted approaches.

and so completely missed previously by those "skilled in the art."

Moreover, simplicity, far from being an objection to invention, "may constitute its great excellence and value." Chesapeake & Ohio Railway Co. v. Kaltenbach, 4 Cir. 1938, 95 F.2d 801, 804; "* * * some of the simplest advances have been the most non-obvious." Van Veen v. United States, Ct.Cl.1966, 151 USPQ 506; Webster Loom Company v. Higgins, 1882, 15 Otto 580, 105 U.S. 580, 591, 26 L.Ed. 1177; Eastern Rotocraft Corp. v. United States, Ct.Cl.1966, 150 USPQ 124; Refractolite Corporation v. Prismo Holding Corporation, 2 Cir. 1941, 117 F.2d 806, 807; "It only remains now for the wisdom which comes after the fact to teach us that * * * [Reifers] discovered nothing, invented nothing, accomplished nothing." (Carnegie Steel Co. v. Cambria Iron Co., 1901, 185 U.S. 403, 446, 22 S.Ct. 698, 715, 46 L.Ed. 968).

The claims in question read as follows:

"1. In an integral and nestable egg carton made of relatively flexible molded pulp, a cellular tray portion having a front side, a rear side, and two ends, an inverted dished cover hinged to said tray portion, means for latching said tray portion to said cover with a latch located above said tray portion and extending completely through said cover from the inside to the outside, said tray portion having its front side strongly tied to its rear side by a plurality of spaced cell-forming partitions extending generally parallel to said tray portion ends, said partitions acting as means for preventing spreading of said front side from said rear side, said tray portion including egg cells adjacent but below the latching means, said inverted dished cover having a planar top, a front side, a rear side, and two ends, said front side being connected to said rear side only by said two ends and said planar top so that the front side is relatively flexible and is not rigidly tied to said rear side intermediate the ends of said front side, said front side of said cover having an opening formed therein through which the latch is adapted to extend completely from the inside to the outside, said dished cover being hinged to said tray portion along its rear side, a latch holding flap hinged to the front side of said tray portion, the hinge line connection of said cover with said tray portion and the hinge line connection of said latching flap with said tray portion being maintained parallel by said tying partitions even when the tray portion is loaded with eggs, said latch on said latching flap being located on one side of said tray portion which is opposite to the side where the cover is connected to the tray portion so that both the cover and the latching flap are each connected to the tray portion when the carton is open, said molded pulp egg carton being integrally formed with the latching flap, the upper edges of the two sides and the two ends of the tray portion, the upper edges of the two sides and two ends of the cover generally in the same plane and with the latch extending downwardly from the underside of the latching flap which is hinged to the front side of the tray portion and said latch being relatively close to the tray portion as compared with the opening in the front side of the cover which is relatively remote from the tray portion; when the tray portion is loaded with eggs and the latching flap is turned upwardly and the cover portion is rotated in a direction to telescope over the latching flap, the two hinge lines are relatively immovable but the front side of the cover may flex, whereby the loaded egg carton may be latched by simply rotating the latching flap upwardly and inwardly and rotating the cover upwardly and around the latching flap while the structural features maintain the geometric relation of the latch on the latching flap to the opening in the cover until the front side of the cover engages the latch on the latching flap and is cammed there-

over until the latch on the latching flap registers with the opening in the front side of the cover whereupon the latch passes through the opening in the cover from the inside to the outside to effectively latch the carton.

"2. A nestable molded pulp egg carton in accordance with claim 1, wherein the opening in the front side wall of said cover extends to the planar portion thereof and the latch on said latching flap is near the edge thereof which is remote from the hinge connection of the latching flap with the tray portion."

As will be seen, defendants seek to make much of the structural details, claiming that Reifers could simply have said that he claimed Cox '233 plus buttons and holes.[4] Later, as will also be seen, they say that Claim 1 is fatally defective for failing to include allegedly essential limitations of the specification.[5]

Defendants argue invalidity under 35 U.S.C. sections 101, 102, 103 and 112. Preliminarily, it may be noted that defendants assume a heavy burden in view of the statutory presumption of validity (35 U.S.C. section 282), strengthened by the extended consideration given the application in the Patent Office (Universal, Inc. v. Kay Mfg. Corp., 4 Cir. 1962, 301 F.2d 140; Baker-Cammack Hosiery Mills, Inc. v. Davis Co., 4 Cir. 1950, 181 F.2d 550), and further strengthened by the allowance of Claim 1[6] by the Board of Appeals. (S. H. Kress & Company v. Aghnides et al., 4 Cir. 1957, 246 F.2d 718, 721).

35 U.S.C. section 101.

Defendants claim that the alleged invention is not "new and useful" and does not produce a "new, useful and unexpected result." The contention that the invention is not useful can be dismissed off-hand. Its commercial success is clearly established, and is admitted by defendants with attempted explanations and qualifications as to the reasons therefor. It was "new" in the ordinary sense that Reifers for the first time disclosed it. Defendants' main argument is that the result was not unexpected, and the stock citations are made of Richards v. Chase Elevator Company, 1895, 158 U.S. 299, 302, 15 S.Ct. 831, 39 L.Ed. 991; Great A. & P. Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162; Altoona Publix Theatres v. American Tri-Ergon Corp., 1935, 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Heyl & Patterson, Incorporated v. McDowell Company, 4 Cir. 1963, 317 F.2d 719, 722; Servo Corporation of America v. General Electric Company, 4 Cir. 1964, 337 F.2d 716, 719; Goldman v. Polan, Katz, 4 Cir. 1938, 93 F.2d 797, 799.

It is contended that Reifers and Cox '233 are identical except for the "buttons and holes"; and that buttons and holes are old. But buttons [or tabs] and holes had been tried by others, including Cox in carton PX–106 which in a general way corresponds to his '233 patent.[6a] It was only when the particular buttons and holes of Reifers were used in a particular (and different) manner and relation to molded pulp egg carton constituent parts that a new and unexpected result—a satisfactory self-locking carton—was obtained.

35 U.S.C. section 102.

The pertinent portions of this section provide that:

"A person shall be entitled to a patent unless  *  *  *

---

4. Defendants' counsel even started to argue this, apparently seriously, but soon admitted that a claim so phrased would have been clearly invalid.

5. This seems to be somewhat of a Procrustean bed approach, under which a patentee is damned for saying more than, or less than, an alleged infringer now says was permitted or required.

6. Present claim 2 had been allowed by the Examiner, who, however, disallowed present claim 1. How a claim dependent on a disallowed claim can be granted is not clear to this court.

6a. Cox did not illustrate the use of the tab-lock in his '233 patent.

\* \* \* \* \* \*

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention."

In 1955, PCA commenced the sale of 3 x 4 [7] molded pulp egg cartons, with snap locks similar to those in the Reifers application, and in plaintiff's cartons which had been on the market since 1953. On or about December 3, 1956, PCA received notice of alleged infringement of the Cox '233 patent, and shortly thereafter discontinued the production of the 1955 carton. In December 1957, PCA introduced a new 3 x 4 flat top carton. PCA contends that as during the period 1955 to May 1958, Reifers had claims pending which called for constructions differing from the PCA cartons, the PCA cartons were in "public use" and a bar to Reifers.

The main argument is that although the PCA cartons used locking lugs on the flange portion hinged to the tray, which entered into holes in the front cover, from the inside out, Reifers called for space between the front cover and the eggs, and for the lugs to be positioned between the cells, while in the "PCA carton of 1955 the locking lugs formed on the flange were disposed in front of two of the cells in the front row of cells and at approximately the maximum girth of the accommodated eggs with the result that the eggs served as abutments for the lugs so as to retain the latter in locked positions within the openings. Thus, the eggs prevented depressing the lugs in order to open the cover of the PCA 1955 carton." [8]

Whether in fact the eggs did prevent "depressing the lugs in order to open the cover" is questionable. Defendants' argument ignores the variation in the sizes of eggs. [9] It is doubtful, if indeed the lugs could not be depressed to open the cover, that the cover could be closed (satisfactorily) by automation, since it would be necessary delicately to depress the flange, to spring the front side of the cover forwardly and to draw it down below the lugs before releasing it. Moreover the housewife, seeing a carton with no instructions for opening, but with lugs that invite "Push me in" is going to do just that; and if the eggs prevent depressing the lugs, then the eggs themselves are going to be depressed. [10]

All this, however, would at the most go to infringement as to which it will further be considered, rather than to validity.

It is contended that the mere pendency of limited claims, not broadened until after the PCA cartons appeared, evidenced an intention to abandon a broad inventive concept, and that in any event failure to amend to reassert broader claims within one year of the first commercial sale of PCA's 1955 carton falls within the prohibitions of section 102(b) barring the issuance of a patent on grounds of a prior "public use". Exclusive reliance for these contentions is placed upon Victor Talking Machine Co. v. Brunswick-Balke-Collender Co., D.Del. 1923, 290 F. 565, affd. 3 Cir. 1925, 8 F.2d 41 (per curiam) and General Electric Co. v. Hygrade Sylvania Corporation et al., S.D.N.Y.1944, 61 F.Supp. 476. Before taking up these cases, a consideration of the prosecution of the Reifers applications, and of other pertinent pro-

---

7. 3 x 4 refers to the cell arrangement, in a twelve-egg carton, of three rows of four cells; 2 x 6 is two rows of six cells.

8. PCA Brief of October 2, 1967, page 26.

9. According to the testimony, the classification of eggs into jumbo, extra large, large, small, etc. relates primarily to the weight per dozen of eggs, so that the size of each egg in the dozen need not be, and generally is not, identical. Defendants' argument also ignores the fact that although all eggs are oval, they may vary from nearly round to long ovals.

10. With "depressing" physical consequences.

visions of the patent laws, will be necessary.

The original Reifers application was filed May 24, 1952 (PX-1) and was expressly abandoned December 17, 1953 after the filing on December 16, 1953 of a co-pending continuation-in-part application (PX-2) which was in turn expressly abandoned on April 24, 1957, after the filing on April 19, 1957 of a copending continuation application (PX-3) on which the patent in suit issued. All three applications disclose and illustrate the same type of molded pulp egg carton with minor variations from the illustrated embodiment in the first application. The patent in suit in the first paragraph references the earlier filed applications, and on February 17, 1959 the Patent Office held that "the subject matter presently claimed is entitled to the date of applicant's abandoned application" filed May 24, 1952.

Clearly, the manufacture and sale of PCA cartons beginning in 1955 was not more than one year prior to May 24, 1952 or even December 16, 1953. Were PCA correct in this approach, then the sale by plaintiff of molded pulp egg cartons in 1953 would be a "public use", and no applicant for a patent could safely manufacture the product sought to be covered by the patent earlier than one year prior to the (unknowable) issue date of his patent. Similarly, this approach would mean that no applicant could safely permit the issuance of a foreign patent more than one year prior to the issuance of his United States patent, section 102(b) making no distinction between public use or sale, and subject matter patented or described in a printed publication in this or a foreign country. However, the Patent Office ruled that the counterpart Shellmar Australian Patent No. 164,896, issued July 2, 1953, could not be applied against the Reifers application that matured as the patent in suit.[11]

In so doing, the Patent Office necessarily concluded that Reifers had met the requirement of 35 U.S.C. section 120, which in pertinent part reads:

"An application for patent for an invention disclosed * * * in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains * * * a specific reference to the earlier filed application."

The only question therefore on this point is whether there has been an "abandonment" by Reifers of his right to Claims 1 and 2. The allowance of the original filing date is clearly an indication that the Patent Office thought there had been no abandonment. See Protective Closures Co., Inc. v. Clover Industries, Inc., W.D.N.Y.1953, 112 F.Supp. 342, 345.

Defendants urge that Victor Talking Machine Co. v. Brunswick-Balke-Collender Co. et al., D.Del.1923, 290 F. 565, affd. 3 Cir. 1925, 8 F.2d 41, "would seem squarely in point"; the "point" apparently being the contention that Reifers should have filed a broader claim readable on PCA's commercial sale of its 1955 carton within one year after PCA began such commercial sale. However, Victor was not an infringement suit, it was an interference suit brought under Revised Statutes, Section 4918 (now 35 U.S.C. § 291), and involved a claim stricken out of an application of April 4, 1911 and then sought to be copied into the same application in June 1915, from a patent issued January 11, 1910, for purpose of interference under Revised Statutes, Section 4904. The present counterpart, 35 U.S.C. § 135, provides in part that:

" * * * a claim of an issued patent may not be made in an application un-

---

11. Plaintiff's Exhibit 3, page 83.

less such a claim is made prior to one year from the date on which the patent was granted."

The holding in Victor that the failure earlier to copy the claim of the issued patent was an abandonment would seem inevitable, but irrelevant to this case.

Defendants also contend that the "rationale" of Victor "was subsequently followed in" General Electric Co. v. Hygrade Sylvania Corporation et al., S.D.N.Y.1941, 61 F.Supp. 476. The only similarity is that General Electric also dealt with abandonment, but in an infringement suit, with respect to claims relating to luminescent or fluorescent material enclosed in a lamp tube, or disposed in the path of spectral ray emission. In the course of the prosecution of the patent application filed December 19, 1927 the applicant had eliminated on August 28, 1928 "the references to luminescent material originally contained in the specification and Claims 16 and 17," and while "the original specification, including the paragraph on luminescent material, was restored by amendment on October 12, 1932, * * * claims 16 and 17 were not; that nothing further was added to the specification in relation to luminescent material until October 31, 1939, and no claim embodying luminescent material was part of the application between August 28, 1928, and October 6, 1939." (61 F.Supp. at pages 497–498).

This was held to be an abandonment of any claim to the use of luminescent material.[12]

■ Certainly Reifers' disclosure of his invention continued unbroken from the original application in 1952. It is probable that, although the claims were

changed from time to time (none being allowed until the issuance of the patent), there always existed claims broad enough to cover PCA's 1955–1957 production.[13] However, this probability need not be further explored as where the original application contains an adequate disclosure of the invention finally claimed, there can be no effective intervening public use, Coats Loaders & Stackers, Inc. v. Henderson et al., 6 Cir. 1956, 233 F.2d 915, 924; Sears, Roebuck & Co. et al. v. Jones et al., 10 Cir. 1962, 308 F.2d 705, 708; even where the rejection of narrow claims is followed by the allowance of a broader claim, Packwood Manufacturing Co. v. St. Louis Janitor Supply Co., 8 Cir. 1940, 115 F.2d 958, 962; King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc. et al., 10 Cir. 1965, 354 F.2d 533, 535, 539; Jacquard Knitting Machine Co. v. Ordnance Gauge Co., Inc., E.D.Pa.1957, 95 F.Supp. 902, 907; Technicon Instruments Corp. v. Coleman Instruments, Inc., D.Ill.1966, 255 F.Supp. 630, 641.

35 U.S.C. section 103, reads as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Defendants contend that the Reifers '094 patent is invalid in the light of

12. Defendant does not cite Muncie Gear Works v. Outboard Marine and Manufacturing Co., 1942, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171, thus apparently agreeing with this court's opinion that that case merely holds that the subject-matter of claims in public use more than two years before such subject-matter was introduced into the specification, rendered claims drawn to such new subject-matter void. See 315 U.S. pages 761, 763, 768, 62 S.Ct. 865; and see Ransburg Electro-Coating Corp. v. Proctor Electric Co., Inc. et al., D.Md.1962, 203 F.Supp. 235, 247; affd. 4 Cir. 1963, 317 F.2d 302.

13. Claim 13 of the second application; PX–2, pages 34–35.

either of two[14] patent combinations: (a) Cox patent No. 2,771,233 and Hunziker patent No. 1,354,042; or (b) Koppelman patent No. 2,093,280 and Cox patent No. 2,517,465.

(a) Cox patent No. 2,771,233 and Hunziker patent No. 1,354,042.

The Cox carton PX–106 made under the '233 patent is for the egg cell structure used in Reifers, but with the male members on the cover portion and the female members in the tray portion, the entry being from outside in. No further comments in this connection are necessary.

Hunziker patent No. 1,354,042 is for a "Cigarette Case", of thin sheet metal bent to form an enclosing box-like structure adapted to be opened up by a hinge-like action to permit cigarette packages to be inserted therein or removed therefrom. The sheet metal blank was formed with extensions 8 and 9 at its opposite ends. When folded, the end portions 8 and 9 and the wings (ends) would be thrown at approximately right angles to the flat surface of the blank, and the end extensions 8 and 9 form two cooperating edge-forming flanges; the edge of flange 9 being slightly offset at 9ª. Closing and opening are described as follows:[15]

"The edge flange 8 is formed with a notch 10, and the offset portion 9ª of the edge flange 9 has an outwardly pressed boss 11 that is beveled on its upper side and terminates in a sharp shoulder. When the case is closed, the boss or lug 11 will cam itself into interlocking engagement with the notch 10, and to release the same from the said notch when it is desired to open the case, the flange 9 must be sprung inward by pressure from the fingers."

What was claimed was:[16]

"A cigarette case formed from a single piece of sheet metal bent on a curve at its intermediate portion to form a bowed spring acting edge wall, tending to open the case, and with the two sides forming portions of the sheet at their edges and ends having cooperating lapping flanges, said edge forming flanges having yieldingly engaging interlocking elements, and one of said end forming flanges adjacent to the bowed edge of the case, having a passage that is always open when the case is closed, to permit the endwise discharge of cigarettes, one at a time, all of the other edge forming flanges having curved ends located immediately adjacent to said bowed edge of the case, substantially as described."

The Hunziker patent is for a cigarette case. The claim does not refer to a lock, and the lock certainly was not an object of the patent.

The court is familiar with the increasing liberality with which courts have treated or applied "analogous arts" in considering obviousness. (Graham v. John Deere Co., 1966, 383 U.S. 1, 19, 35, 86 S.Ct. 684, 15 L.Ed.2d 545; Keyes Fibre Company v. Packaging Corporation of America, D.Del.1966 (not officially reported)). However, it is convinced that Cox '233 and Hunziker '042 do not make Reifers '094 obvious.

(a) The fields are certainly not reasonably analogous. While a question of closure is involved in Hunziker and Reifers, one relates to a metal container for cigarettes, the filling and emptying of which is specifically designed for manual operation. The other relates to a molded pulp carton for fragile objects, in which automated filling and manual emptying (with perhaps the removal of only one egg per opening), is primarily intended.

14. Defendants had no such positiveness in the pretrial proceedings, in which great vacillation occurred in combination choices. While immaterial if the final choices are valid, the difficulty suggests not obviousness, but ingenuity on the part of the inventor.

15. Page 1, lines 70–80.

16. Page 1, lines 109–110; page 2, lines 1–15.

(b) How would a prospective patentee in the field of locks for molded pulp egg cartons ever learn of Hunziker '042? Granted that if Hunziker '042 were an *anticipation*, every subsequent inventor would be charged with knowledge thereof, however obscure it might be, and whether or not reduced to practice—B. F. Goodrich Co. v. United States Rubber Co., D.Md.1956, 147 F.Supp. 40, 63, affd. 4 Cir. 1957, 244 F.2d 468; Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir. 1945, 147 F.2d 345, 350; E. J. Brooks Co. v. Klein, 3 Cir. 1940, 114 F.2d 955—Hunziker '042 is not even remotely urged as an anticipation of Reifers '094. Would the most diligent of patentees, seeking a locking device for a molded pulp egg carton, ever be led to Hunziker '042? The Patent Office did not pick up, and never has picked up, Hunziker '042 as an element of anticipation or obviousness. The firm of attorneys, representing the present defendants, while representing Lambert (formerly Chief Engineer of Mapes, PCA's predecessor) did not discover Hunziker '042 in the prosecution of the Lambert Application Serial Number 512,055, filed May 31, 1955, since abandoned, for "Molded Pulp Egg Carton," for a patent now claimed by defendants to be for the same "invention" as Reifers '094. The Danish patent agents, Budde Schou & Co., consulted by attorneys for defendants, also did not pick up Hunziker '042.

In fact, Hunziker '042 issued in Class 206 "Special Receptacles and Packages", subclass 41 "Receptacles Pocket and Personal Use"—"Cigars and Tobacco"; is classified [referenced] only in Class 206, subclass 41; and is cross-referenced only in Class 220, "Metallic Receptacles", subclass 62 "Blanks" [17]. How even the most diligent applicant in the field of molded pulp egg cartons, or in any field other than Receptacles Pocket and Personal Use—Cigars and Tobacco—Metallic Receptacles—Blanks—would have found Hunziker '042, or how defendants' counsel, after the abandonment of the Lambert application, found the reference, is on the record a complete mystery.

Reifers '094 is in Class 229–2.5.

(c) Even had Hunziker '042 been found, it is not apparent how a Patent Examiner, an applicant for a patent, or patent counsel (except after suit for infringement and years of cogitation) would have thought it to be pertinent—with or without Cox '233 or its equivalent. As defendants' expert (not himself an expert in the field of molded pulp egg cartons) admitted, Hunziker clearly was not concerned with the molded pulp industry, as it used metal blanks.[18] Hunziker had no flap, or hinged flange, on the "tray" portion, a feature indispensable in Cox '233 and Reifers '094 for purposes of automated loading and closing; and for safety loading. Opening in Hunziker was accomplished by pushing in the entire bottom or tray section—not pushing in the lug or a flange; and loading was to be from the side, not from above. The Hunziker locking system would be completely (commercially) impracticable in a molded pulp egg carton without serious modifications—e. g., a hinged flange on the "tray" section, which would not only not be suggested by Hunziker, but which would make Hunziker unworkable.

The court has been referred to no authority for the proposition that, and has a presently insuperable difficulty in understanding how, a device which requires a modification making it unworkable suggests such a modification in any field, let alone an unrelated one.

b. Koppelman patent No. 2,093,280 and Cox patent No. 2,515,465.

---

17. Certification dated February 9, 1968 from the First Assistant Commissioner of Patents, obtained, and to be filed as part of the record herein, in response to the Court's request on December 6, 1967 for a statement or certification of the classification, and cross-referencing, of Hunziker '042. Defendants criticize this certification as not relating to the period 1952–1953. The court would assume that a present classification and cross-reference would be at least as broad as those of 1952–1953. Defendants have offered no evidence or claim to the contrary.

18. Transcript, 2451–2452.

The court is immediately impressed by the fact that defendants did not cite the Cox '465 patent in their original answer; that their counsel did not consider the Cox '465 as a deterrent to the Lambert application (supra and infra), but that non-disclosure of Cox '465 to the Patent Office is the strongest single element urged in their contention that fraud was practiced on the Patent Office. Again, if the combination of Koppelman '280 and Cox '465 does render Reifers '094 obvious, then the above factors are not controlling; but these factors do suggest the question of when obviousness is to be determined; at the time of the alleged invention, and the Patent Office procedure; or with the 20/20 (corrected?) vision of hindsight and advocacy.

Although there was no evidence that Koppelman '280 had ever been constructed, or that any one had ever seen a physical embodiment of such a structure, and although there was uncontradicted affirmative evidence that it could not be commercially made, and if made would be inoperative, defendants emphasize the presumption that the issuance of a patent is "some evidence of its operativeness". (Dashiell v. Grosvenor, 1896, 162 U.S. 425, 432, 16 S.Ct. 805, 40 L.Ed. 1025; Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir. 1945, 147 F.2d 345, 348).

Koppelman purportedly discloses a molded egg carton made complete in a single molding operation; a cover and tray section, each cellular; a flap hingedly connected to the upper section; apertures preferably of holes through the front wall of the lower section; and that when forced between the eggs and the cups, the flap will be placed under tension, causing substantial frictional coaction, increased by the tendency of the flap to return to its original position.

Defendants then argue that inverting this structure would not unduly tax the ingenuity of one skilled in packaging articles such as eggs. As set forth[19], defendants in this argument have demonstrated considerably more "ingenuity" than Koppelman did, or intended. Interestingly, in the prosecution of the abandoned Lambert application Serial Number 512,005, counsel for the applicant, a member of the same firm of attorneys now advancing the argument that little ingenuity would be required to invert Koppelman, argued with equal earnestness that Koppelman did not provide for a camming action of the locking flap, and that this would be true even if Koppelman "were turned upside down." [20]

---

19. Defendants' Brief of October 2, 1967, page 39, reads as follows, italics added:

"The Koppelman '280 patent is pertinent insofar as it discloses (a) an egg carton made complete in a single molding operation (page 1, column 2, lines 50 to 53); (b) a flap 12 hingedly connected to the front wall of *one of the carton sections* (page 2, column 1, lines 18 to 32); (c) an aperture 19 formed in the front wall of the *other* section (page 2, column 2, lines 7 to 9); and (d) that frictional coaction exists between the flap and the front wall of a *carton section* which is attributable *in part at least* to the tendency of the flap to return to its original position (page 2, column 1, lines 42 to 47)."

The specification *in fact* read (emphasis supplied):

"In the form of Figs. 1 and 2, a continuous flap 12 runs along the outer longitudinal edge of the *upper section 2* * * * so that the first user can on closing the carton * * * turn the flap in to a position substantially at right angles to its original position and *slip it inside* the outer forward wall *of the bottom section 1.* (page 2, column 1, lines 18 to 32).

"The apertures 19 are preferably holes extending through the *front wall of the lower carton section* * * *" (page 2, column 2, lines 7 through 9).

"This flap * * * *when forced between the eggs and their cups* * * * will be placed under tension and distorted slightly, *causing substantial frictional coaction* tending to hold it in this position. This frictional coaction is also *increased* by the tendency of the flap to return to its original position * * *" (page 2, column 1, lines 32 through 47).

20. Plaintiff's Exhibit 5, pages 19–20.

Furthermore, it is clear that Koppelman stressed the function of the eggs in effecting and maintaining the closure:

"By the present improvements a locking device which not only takes advantage of the weight of the eggs and their pressure against the walls of the carton is provided * * *" (Page 1, col. 2, lines 41–44).

The flap "when forced in between the eggs and their cups and inside the connecting portions 6 * * * will be placed under tension and distorted slightly, causing substantial frictional coaction tending to hold it in this position * * *" (Page 2, col. 1, lines 37–42).

"[I]n which position they are held by the outward pressure of the flap and the pressure of the eggs in the adjacent cells against it * * *," (Page 2, col. 1, lines 71–74).

" * * * [T]wo of the most important features of" the present invention "reside in the construction and arrangement whereby the weight and pressure of the articles in the carton are employed in part to hold the closure and whereby the entire carton and its locking means may be made in a single molding operation." (Page 3, col. 1, lines 2–8).

Certainly gravity could not be inverted with the inversion of the carton, and "weight and pressure of the articles in the carton" could *not* "be employed in part to hold the closure."

The Board of Appeals, in reversing the Examiner's rejection of Reifers Claim 23 (now Claim 1) on Koppelman, very tersely considered and disposed of the inversion argument, saying:

"While Koppelman shows a pocketed tray portion, he does not show an inverted dished cover portion of the character claimed. To utilize Koppelman's carton in an inverted position would be contrary to the teachings of Koppelman since in Koppelman his locking device takes advantage of the weight of the eggs and their pressure against the wall of the carton * * *" [21]

As noted, defendants claim that by inverting Koppelman and adding the locking features of Cox '465, the Reifers carton was obvious. On the question of obviousness certain thoughts at once occur. If Cox '465 so clearly taught the Reifers lock, why is it that (a) Cox, who was familiar with Koppelman '280, did not himself invent the Reifers carton; (b) the Examiner cited, but did not rely on, Cox '465 in the first rejection of the first Reifers application[22] and apparently thought so little of it that it never again appears in the file wrappers of any of the Reifers applications[23]; (c) it was not cited as prior art in defendants' original answer to the complaint herein; (d) it did not deter the filing of the Lambert application; and Cox '465 was not noticed of record until December 1, 1965.[24]

Cox '465 does disclose (a) a locking flange 22 hingedly connected to the upper edge of the front wall of the tray section; (b) a locking flange carrying locking tabs 24 adapted lockingly to engage slots or openings 21 from the outside in, the engagement occurring above the top of the tray section; and (c) the location of the tabs when in locking engagement "preferably" being such that the "locking tabs will be partitioned between adjacent eggs." [25] although it is by no means clear that this would be the case in the structures shown in Figures 5 and 7. Also, Cox alternatively provided for the use of thermo-plastic adhesives to effect a closure.[26]

21. Plaintiff's Exhibit 3, pages 180–181.

22. Plaintiff's Exhibit 1, page 30.

23. A matter repeatedly stressed by defendants in the "Unclean Hands" defense against enforceability.

24. Defendants' Motion to Amend.

25. Column 3, lines 27 through 29.

26. Column 3, line 70; column 4, line 6; and Figure 9.

The evidence is clear and uncontradicted that Cox '465 never went into commercial production[27]; the tabs had a tendency to "butt into the eggs on the inside of the carton; "[28] the tabs tore off, "you couldn't get them out, the front flap upon which the tabs were located had a very bad habit of bowing outwardly, even when the tabs were in the slots", and the inventor, Cox did "not believe anyone could develop a machine which would put those tabs in there."[29]

Defendants agree with the deficiencies of the Cox '465 for in the PCA patent 3,289,911[30] it is stated:

"With * * * the Cox [2,517,465] * * * carton there is a serious problem of accidental opening of the carton while it is being handled by the packer, merchandiser, or customer. In the Cox type carton a substantial part of the latching flap is exposed and thus susceptible to being accidently torn open. * * *"

Lambert "Contemporaneous" Effort.

Reifers conceived the alleged invention of the patent in suit on February 21, 1952, and immediately made a disclosure thereof to several officers of plaintiff; showed them a successful hand-made model; prepared written data of invention on March 3, 1952; and filed his first patent application on May 24, 1952.

Defendants contend that Lambert, PCA former Chief Engineer, developed a molded pulp egg carton utilizing a locking device "similar to that of Reif-

ers and Hunziker at least as early as June 11, 1952." This is based upon an engineering progress and work report[31] dated July 14, 1952. In part this "progress and work report" reads as follows:[32]

"A 2 x 6 egg carton has been designed to pack in the standard egg case. *A print of this carton is attached to this report. We believe that a satisfactory cover lock has been designed for this carton.* It may be opened and closed many times without damage to the lock or carton. When lifting the carton by the cover, the lock holds more securely due to the pinching action of the fingers. The carton may be easily opened for inspection of the eggs and the cover again locks securely when pressed back in place. *A hand-made sample of this carton lock was made for demonstration.* Designs for the pick-up mold and transfer are practically finished and work can be started on the experimental mold this week. Considerable thought and some ingenuity was required to design this mold, form the screens, mold the crease for folding the cover and to mold the lock and slot. The mold will fit the adaptor plates on our molding machines and can be molded on either the old or new machines at Griffith."

Lambert at first testified that he submitted a sample egg carton with a lock on it to the Board in July 1952, of the "type" of carton identified as DX–110–110A. A job card was prepared on which expenses attributable to experimental molds were entered. Lambert

---

27. Transcript, 1836; 1965.

28. Transcript, 2099–2100.

29. Transcript, 1964. The court had previously questioned if '465 was susceptible to automation, saying (Transcript, 44–45):

"Of course, anything can be done; but what you would have to do is make an arc out of this fastening piece on the tray and then relax it and push it in at the same time and then straighten it out and I suppose that, could be done by machinery, but it is in no way comparable to simply pushing in and closing the lid."

30. To Boyd and Thaldorf, assignors to PCA, Plaintiff's Exhibit 179A, issued December 6, 1966 on application filed March 5, 1965 (column 1, lines 41–46). Applicants were represented by defendant's present Chicago counsel.

The inventors also question the reliability of the lock on the "Reifers style carton."

31. Defendants' Exhibit 139.

32. Defendants' Post-Trial Brief, pages 46–47; Defendants' emphasis.

frankly admitted, however, that his 2 x 6 carton was not satisfactory, defendants contending that the decision not to go ahead was based on "commercial reasons." It would be difficult to find a better reason.

Defendants urge that the independent development of an idea or "invention" by several persons at or about the same time is evidence of obviousness, and that no invention was involved. (Concrete Appliances Co. v. Gomery, 1925, 269 U.S. 177, 185, 46 S.Ct. 42, 70 L.Ed. 222; Ruben Condenser Co. v. Aerovox Corp., 2 Cir. 1935, 77 F.2d 266, 268; Teleflex, Inc. v. American Chain & Cable Co., S.D.N.Y. 1967, 273 F.Supp. 573.) Defendants also contend that the filing of a patent application by Lambert on May 31, 1955, thereby asserting that Lambert's product was an invention, is not entitled to "great significance" in testing the validity of Reifers patent, relying exclusively on Houston Oil Field Material Company v. Claypool, 5 Cir. 1959, 269 F.2d 134. That decision, however, while holding that prior inconsistent conduct of a party "cannot control", also recognized that such conduct is "important evidence." That it is of "the highest degree of significance" see Ransburg Electro-Coating Corp. v. Proctor Electric Co., D.C.Md.1965, 242 F.Supp. 28, 36; reversed on other grounds, Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corp., 4 Cir. 1968, 395 F.2d 92.

In the Claypool case, the decision of the Fifth Circuit was founded primarily upon its conclusions that everything of significance claimed by the patentee had been disclosed in three prior patents, with no advantages shown in any departures therefrom; and that the patentee was barred by prior publication.

The Lambert claim of invention, moreover, is suspect. In the portion of the engineering and progress report, quoted above, it is stated that an "egg carton has been designed"; it is not said by whom. The record contains no testimony of any written data of invention. The "hand-made sample" allegedly "made for demonstration" has never been produced; and it appears to be conceded that no such sample was presented to PCA's Board, since Lambert testified on deposition that "Any samples submitted to the Board were molded" [33], and no molds were finished until February 8, 1953.[34] Lambert also testified on deposition that "the carton was not satisfactory, as you can probably see for yourself, that it is not a satisfactory carton." [35]

"An inoperable invention or one which fails to achieve its intended result does not negative novelty." (United States v. Adams, 1966, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572.)

Moreover, Lambert did not file an application for a patent until May 31, 1955, more than three years after the Reifers application was filed, and some two years after the Reifers carton had commercially appeared on the market.

Under the circumstances of this case, the court finds as a fact, and concludes as a matter of law, that there is no satisfactory evidence that Lambert conceived a molded pulp egg carton with a lock similar to the Reifers lock, at or about the time of the Reifers conception; and that such lock by PCA's engineers, if in fact conceived in 1952, was impractical and does not negate the usefulness or novelty of the Reifers lock, or demonstrate that it was, or would have been, obvious to one skilled in the art.

State of the art—efforts by others.

The criteria to be applied in determining novelty were well stated by Judge Learned Hand in Ruben Condenser Co. v. Aerovox Corporation, 2 Cir. 1935, 77 F.2d 266, 268:

"We should ask how old was the need; for how long could known materials and processes have filled it; how long

---

33. Plaintiff's Exhibit 173–A, page 142.

34. Ibid. page 145.

35. Ibid. page 80.

others had unsuccessfully tried for an answer. * * * "

Expanded Metal Co. v. Bradford, 1909, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034:

"It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor."

Marvel Specialty Co., Inc. v. Bell Hosiery Mills, Inc., 4 Cir. 1964, 330 F.2d 164, 172:

"In view of the apparent need which so long persisted, the obvious benefits to be gained by both the inventor and the industry from meeting the need, and the failure of anyone to meet it, we think the finding of patentable invention can be sustained even without considering the statutory presumption of validity."

Although for more than forty years there had been interest on the part of egg carton manufacturers, including PCA, in the manufacture of molded pulp cartons[36] it is only recently, despite optimistic forecasts, that the sales of the molded pulp egg carton have caught up with those of the paperboard carton. Aside from the paperboard carton's superiority as to printing and decoration, the main problem faced by the molded pulp egg carton was that of automation, including, perhaps predominantly, automation of a means for satisfactory locking and unlocking.[37] As in the case of the paperboard carton, the molded pulp egg carton would have to be a good egg carrier; nestable; lockable in automation, and lockable and unlockable by the housewife.[38]

Included in the entrepreneurs were:

1. Winfield H. Mapes, Senior, active as an executive and director of Mapes Consolidated Manufacturing Co., PCA's predecessor corporation. He worked with Morris Koppelman (of '280 fame) in the development of a 2 x 6 egg carrier consisting of a cardboard box or wrapper with a filler and a top or bottom of a molded board "flat," or base or top. The patent[39] became an abandoned experiment.

2. Morris Koppelman. On November 23, 1927 Koppelman filed an application for his patent 1,846,561[40] for a 2 x 6 carton made "preferably by the pulp sucking or felting process", tri-fold, with a top with a front wall from which extended tongues adapted to be passed into slots to hold the cover in place. Again, there is no evidence that this carton ever appeared on the market, and it seems that Koppelman '280 was intended as an improvement.

3. William J. DeReamer, Chief Engineer of a predecessor of PCA, in which he was a substantial stockholder, had several patents, one of which, No. 2,061,064[41] was along the lines of Koppelman, in that a flap on the front edge of the cover was stuffed in alongside the eggs, the friction (hopefully) being sufficient to prevent accidental opening of the carton.[42] Another DeReamer patent 2,061,065, filed and issued on the same date as '064[43] disclosed a 2 x 6 egg tray adapted to be inserted in a paperboard sleeve.

There was offered no evidence that either of the DeReamer cartons was ever produced commercially, although there is

36. Pretrial order, page 4, November 22, 1966.

37. Transcript, 753, 769, 777; 1276; 1333; 2088.

38. Transcript, 1955–56.

39. Number 1,690,492; Px–73; Px–143.

40. Px–143, Px–40–A.

41. Px–6A; Px–40A; Px–143; No. 2,061,-064, issued November 17, 1936.

42. Ibid, page 2, column 1, lines 26–28.

43. Px–15; Px–40A; Px–143.

some evidence that the filler of '065 was produced experimentally[44].

4. Francis H. Sherman, one of the founders of a corporation which after being succeeded by a second, was merged into plaintiff. He was a molded pulp egg carton designer, and the holder of a series of molded pulp egg carton container patents, including the patent on the Tab-Lock carton, No. 2,587,909 [45]; as well as a number of others. These included No. 1,975,127 [46] a molded pulp and paperboard carton, not produced commercially; No. 1,975,128 [47] a container or package for eggs, not in fact manufactured; No. 1,975,129 [48] which showed a metal clip, not at first, but later, used; but the container was unsatisfactory except when placed in a paperboard sleeve.

A company later incorporated into plaintiff, from 1938 to 1942 tried to find locking means for molded pulp egg cartons, using rubber glues; thermoplastic glues; stitches; clips; staples [49].

The Sherman patent No. 2,587,909 [50] for a molded pulp egg carton with tab-lock extending down from the front cover for insertion into the front of the container showed several forms of tabs. If successfully inserted, they tended to become disconnected in transit, and if not, to be broken by the first opening of the carton. These were sold from 1944 to 1950, and were not considered to be satisfactory locks.[51]

5. Lile H. Brown, engineer and designer for predecessor corporations merged into plaintiff, obtained a patent, No. 2,636,660,[52] on a molded pulp egg carton which had two tab-locks and a flap hinged to the front side of the tray, which flap could be set inside the cover.[53] The carton was never commercially produced.[54]

6. Harold S. Crane, now a vice-president of plaintiff [55], had been employed by corporations merged into plaintiff. He did quite a bit of experimentation with locks which was his "favorite indoor sport." [56] His patent 2,677,490 [57] was for a 2 x 6 molded pulp carton having two half covers, one to enclose each of two rows of six eggs, with locking tabs on the end of each of the half covers, the tabs folding around each end of the carton into holes in the tray. It was not commercially produced.[58]

7. Merle P. Chaplin, formerly Chief Engineer of Keyes Fibre Company, was a consultant generally to the industry and to a predecessor of plaintiff and then to plaintiff. Adjacent to his home he had a tool and die shop, an engineering department, a pattern making shop and a rather complete although small scale pulp preparation molding and finishing plant, with thirty to forty employees.[59] He obtained Patent No. 2,-423,756 on a molded fibre article [60] consisting of a tray having two half covers folding inwardly, one having two tabs extending from its upper surface for insertion into the other half. This effort "to provide a lock for" plaintiff did not constitute an adequate closure.[61]

8. Ruth M. Schilling produced a three-fold carton with a cellular inner

44. Px–174, pages 9–10; Px–171, page 9; Px–173, page 14.
45. Px–40A; Px–143.
46. Ibid.
47. Ibid.
48. Ibid.
49. Transcript, 228–230; 241–242; 596–602; 1956–1957.
50. Px–40A; Px–143.
51. Transcript, 309–312.
52. Px–40A; Px–143.
53. Transcript, 343.
54. Transcript, 527.
55. A very impressive witness. The court has never seen a witness more meticulous in answering exactly, and only what, was asked.
56. Transcript, 585.
57. Px–40A, Px–143.
58. Transcript, 528, 530.
59. Transcript, 353–354.
60. Px–40A; Px–143.
61. Transcript, 1961; 349–351.

cover and a tray-like outer cover. Patent No. 2,600,130 [62] was introduced into the molded pulp egg carton field about 1950. Although the patentee endeavored to provide a frictional lock, it was completely inadequate [63], and was never sold commercially in this form, but in practice was glued shut. [64]

9. Walter H. Randall who succeeded Merle P. Chaplin and who was the chief engineer and director of research and engineering, and Vice President of Keyes Fibre Company, obtained Patent No. 2,578,739 [65] for a 2 x 6 molded pulp carton having a cellular bottom tray portion and a dished upper cover. No lock is disclosed, but projections on the front edge of the cover would cooperate with recesses in the inner front edge of the egg holding section to resist the tendency of the free edge of the cover section to move outwardly when cartons were stacked, or otherwise subjected to downward pressure. [66]

There was no evidence that the Randall carton was ever produced or used commercially.

10.  John W. Cox. [67]

For about eight years Cox represented Self-Locking Carton Company as its attorney, but his advice extended beyond the mere legal aspects. Self-Locking changed its name to General Package Corporation, and was merged with Diamond in 1956. From about 1939, Cox was head of operations of Self-Locking, and was intimately connected with the egg carton industry. His responsibilities included administration, sales, factory operations, research, engineering and all other functions of the company. He was quite familiar with the molded pulp processes, and was closely associated with the sale and use of egg cartons. [68]

Cox developed automatic egg room equipment used in egg packing plants, and also developed the "so-called continuous motion molded pulp machine, which still is the standard equipment used by" Diamond. Sixteen of these machines "have been constructed at a cost of about $2,000,000 a piece" and are represented by Cox Patents No. 2,879,696 and No. 2,881,679. [69]

In addition, Cox spent "countless hours cutting, shaping, gluing, packing, and otherwise trying to modify molded pulp cartons to try to come up with a commercially acceptable structure." [70]

When Cox first became associated with the egg carton industry, it was just entering automation. With the development of chain stores, supermarkets and other large egg outlets, it became necessary to pack eggs in twelve-egg cartons, which in turn were placed in thirty-dozen case lots. [71] The cartons, then of paperboard, were associated with an automatic set up, conveyor, packer and closer. [72]

Competition required that the molded pulp carton also lend itself to automation. [73]

Despite the lack of a good lock, Cox operated his various egg carton interests with financial success. The court appraised him as a man of pride, and of prudence in the expenditure of company funds. Certainly Reifers' solution was not obvious to Cox, who had repeatedly, and with some ingenuity, tried without success.

62.  Px–6J; Px–143.

63.  Transcript, 1965.

64.  Transcript, 1973; 1129.

65.  Px–1, page 30; Px–6I; Px–40A; Px–143.

66.  Col. 3, lines 49–72.

67.  Cox was referred to in the highest terms by his associates, and recognized by his competitors as one highly skilled in the art. He made a very favorable impression on the court. He very lucidly described the problems of securing a satisfactory lock, the efforts he and others had made to solve the problems, and their lack of success.

68.  Transcript, 2715.

69.  Px–142.

70.  Transcript, 2716.

71.  Transcript, 1951.

72.  Transcript, 1954.

73.  Transcript, 1956.

Cox caused a search to be made in the Patent Office "to unearth every patent bearing on the subject" he "could scratch out" and was familiar with all of them.[74]

Cox devoted much time to the development of the 2 x 6 molded pulp egg carton, and enlisted the aid of his engineers. A number of patents were issued to him, reflecting some of these efforts. Patent No. 2,455,295 [75] issued November 30, 1948 on application filed October 23, 1942 (when Cox was in the Navy) in Cox's opinion licked "the problem of egg room pretty well, but * * * didn't have the sign of a cover lock for it." [76] It had abutments on the cover and body members, but they were intended to be associated with clips or other suitable fastening means.

Another effort to provide a self-locking carton was Cox Patent No. 2,446,264, issued August 3, 1948 on application filed September 20, 1943.[77] This had an inner cover enclosing one-half of the eggs, and an outer cover, designed to snap over the inner cover and to provide frictional engagement. "It was not a secure enough lock, and could not be depended upon to secure the cover from coming off." [78] This was recognized by Cox, since the patent referred to fastening in a closed position, either by adhesives, or staples or clips.[79]

Another effort is represented in Cox Patent No. 2,466,579, issued on April 5, 1949 on application filed September 20, 1943.[80] This called for a double cover that was supposed to lock into indentations in the cross members. In practice it worked satisfactorily when empty, but was inadequate when filled with eggs.[81] Thermoplastic glue, or staples, were specified.[82]

Cox '264 and Cox '579 mentioned above issued from two of three applications sent by Cox from the Pacific and all filed on the same day, September 20, 1943. The third application matured into Patent No. 2,517,465 which issued August 1, 1950.[83] Patent No. 2,517,465 ('465—discussed in connection with the claim of misrepresentation to the Patent Office) was thoroughly covered by Cox in his testimony. It had a front flap attached to the bottom (tray) section to prevent the cover from telescoping over the bottom. Then, representing Cox's best thinking at the time, tabs were placed on the ends of the flap, to be inserted (from the outside in) into slots in the front wall of the cover. On paper it looked good to Cox, but when he saw the actual construction, he recognized that "it was completely impossible." He doubted if a machine could be developed to insert the tabs. The tabs if manually inserted tore off; and the front flap would bow outwardly even if the tabs were inserted.[84] In fact, Figure 9 showed a way of locking the flap to the front wall by thermoplastic adhesive.[85]

Cox's summation was that "This carton was completely inadequate to meet any of our commercial requirements, and never went into commercial use." [86]

The Sherman Tab-Lock [87] was used by Self-Locking Carton Company from 1944 until the Reifers invention, although efforts did not cease to produce other cartons with other locks.

74. Transcript, 1957.

75. Px–40A; Px–143.

76. Transcript, 1962.

77. Px–1, page 30; Px–6D; Px–40A; Px–143.

78. Transcript, 1962–63.

79. Column 3, lines 15–21.

80. Px–40A; Px–143.

81. Transcript, 1963.

82. Column 3, lines 30–37.

83. Px–1, page 30; Px–6G; Px–40A; Px–143.

84. Transcript, 1963–64. The court had independently reached the same conclusion from an examination of the patent.

85. Column 3, line 71—Col. 4, line 5.

86. Transcript, 1964–65.

87. Sherman Patent No. 2,587,909; Px–40A; Px–143. The tabs extend downwardly from the cover, for insertion in the tray from the outside in.

In 1950 Cox filed an application which matured into Patent No. 2,771,233.[88] This held and carried eggs well, and fit into the thirty-dozen egg case. While the Sherman Tab-Lock was used on the carton as manufactured, Cox did not have much confidence in the Tab-Lock, and did not show its use in his patent application. Although relying in part upon frictional engagement of a flap hingedly connected to the tray position, with the forward cover wall, the specific sealing devices disclosed were staples or adhesives.[89]

In practice, a machine developed to lock automatically the Tab-Lock carton was abandoned; it broke too many eggs, and the tabs would break off.[90]

In January, 1952 Cox developed a Three-Fold carton [91] but it could not be satisfactorily stapled, and he went back to the (better, but not satisfactorily automatable) Sherman Tab-Lock.

"Between 1931 and 1952 in which, in spite of some fairly capable brains working on the problem, nothing came along which was satisfactory" [92]. Cox felt it was necessary either "to improve the Tab-Lock or to go back to clips." [93]

Such was the state of, and the level of ordinary skill in, the pertinent art. (Graham v. John Deere Company, 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.)

35 U.S.C. section 112. This section in pertinent part reads as follows:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

Defendants urge that as primary objectives of the Reifers patent are said to be closing and locking of the carton without damaging the eggs by simple automatic machinery operating at high speed, and quick and easy manual unlocking without crushing the eggs, certain structural features mentioned in the specification should have been incorporated in the claims. (On April 9, 1965, in answer to Interrogatory 14 defendants stated: "The claims do not appear to be indefinite or uncertain under 35 U.S.C. § 112".) In part this argument is based upon the highly technical interpretation of the further provision of section 112 that the specification "shall set forth the best mode contemplated by the inventor of carrying out his invention." Reifers in the specification referred to certain objectives and virtues of the patent, and some structural features to be avoided. This portion of the specification is referred to as "indicative in a general way of the nature of the invention." The specification also states that "A singe embodiment of the invention is presented herein for purposes of illustration. However, the invention may be incorporated in other modified forms coming equally within the scope of the appended claims." (Column 3, lines 50–58.) While more apt language, to the effect that the carton described is the "preferred form" but that modifications may be made, could have been used, it is clear that Reifers intended to set forth, but not be limited to, the specific carton described, so long as the "invention" was embodied.[94]

More specifically, defendants refer to "structural features" under which the eggs do not function in respect to the making or maintenance of the interlock;[95] the existence of a substantial top space between the flange and the eggs and the placing of the lugs between the egg cells [96]; positioning of the locking lugs adjacent the top of the flange for

---

88. Px–3, page 83; Px–6M; Px–143.

89. Column 5, line 38–47; 59–64.

90. Transcript, 1971–72.

91. Px–154.

92. Cox, Transcript, 1974–75.

93. Transcript, 1978.

94. Common sense would indicate that an applicant, for purpose of securing his patent, would set forth what at that time he thought was the "best mode", whether or not those very words were used.

95. Column 2, lines 6–8, 10–14.

96. Column 2, lines 15–19; 21–30.

reception in apertures adjacent the top of the cover;[97] "It is the spring of the flange at its stiffly stabilized hinge, coupled with its top flexibility, which are the key to the maintenance of the lock and to its ready disengagement when desired"[98]; and the effect of the location of the locking apertures upon molding and stripping of cartons.[99]

Reifers could not have claimed the Cox '233 patent. In the court's opinion, the disclosure of the locking device (apart from the drawings) would have enabled one skilled in the art to apply it to any of several molded cartons then available (of which Cox '233 was one, if not the best one); and that the claims are accordingly adequate.

Defendants' reliance on Aluminate Co., Inc. v. Akme Flue, Inc., D.Md.1931, 50 F.2d 921; Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., D.Md. 1963, 218 F.Supp. 1, 44, aff'd per curiam 4 Cir. 1964, 327 F.2d 497, cert. den. 1964, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36; and Henry J. Kaiser Co. v. McLouth Steel Corp., D.Mich.1966, 257 F.Supp. 372, is misplaced. These were process patents in which the omission of an indispensable step from a claim would necessarily render it invalid.

Commercial Success.

Apart from the question of commercial success, the court finds the patent in suit valid. To the court, this is not a doubtful case, but if it were, commercial success would be significant. Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., D.Md.1963, 218 F.Supp. 1, 51, aff'd per curiam 4 Cir. 1964, 327 F.2d 497, cert. den. 1964, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36; Servo Corporation of America v. General Electric Company, 4 Cir. 1964, 337 F.2d 716. Defendants do not and could not deny the commercial success of the molded carton with the Reifers lock. The plaintiff, the

defendants, Keyes Fibre Company, Molded Container Corporation and Herkimer Pulp & Packaging Corporation all produce cartons following the Reifers principles.

Defendants contend, however, that this commercial success is not attributable to the merits of the Reifers lock, but to the desirability of molded cartons over paperboard (although the latest figures indicate about a 50–50 market) and to improvements in molded cartons other than the Reifers lock.

It is true that until the Reifers carton was in large scale production, plaintiff continued the sale of the Tab-Lock carton, although experiencing difficulty in large repeat orders. In 1958, three years before the Reifers patent issued, 500,000,000 Reifers cartons were being sold annually.[100]

Defendants also point to another patent to Reifers, No. 3,028,065 issued in 1962, and directed to a "Pillopost" construction, materially strengthening the carton and its contents against downward pressure, and removing the scalloped bays of the Cox '233 carton. The Pillopost carton was not produced commercially until the latter part of 1959[101]; and neither the defendants, nor plaintiff's licensees, Keyes Fibre Company and Molded Container Corporation, use the Pillopost construction.

Interestingly, defendants while challenging the importance of the Reifers lock to commercial success in connection with the question of validity, take a diametrically different view of the significance of the Reifers lock in defendants' anti-trust defense. There they say that "it was plaintiff's specific intent and purpose to get the Reifers patent by intentional fraud in order to monopolize that [the molded pulp egg carton] market"[102]; and that "The monopolistic *results* obtained by plaintiff since 1959–

---

**97.** Column 2, lines 31–38.

**98.** Column 6, lines 55–59. Defendants' emphasis on this feature also emphasizes the inapplicability of Hunziker.

**99.** Column 2, lines 40–50.

**100.** Px–3, page 81.

**101.** Transcript, 937.

**102.** Defendants' Post Trial Brief, page 139.

1960 confirm the intent with which it then acted to obtain its patent." [103]

■ The court finds as a fact, and concludes as a matter of law, that the commercial success of the Reifers carton supports the court's conclusion that the Reifers patent is valid; and were validity doubtful, such commercial success would turn the scales in favor of validity.

Unenforceability.[104]

Defendants contend the Reifers patent in suit is unenforceable (assuming its validity otherwise, and its infringement) because of the "unclean hands" of plaintiff. Although argued in three aspects —conduct in the patent office; conduct subsequent to the issuance of the patent, in the bringing of infringement suits; and violation of section 2 of the Sherman Act through an attempt to monopolize a part of trade and commerce in egg cartons—the fundamental question is whether or not the patent was obtained by fraudulent means. If it were not, suits for infringement would simply be efforts to enforce legal rights associated with every valid patent; and the alleged "monopoly" would simply be the intended and necessary consequence of every valid patent.

Patent Office Procedure.

Defendants' approach, probably correct, is that if in the prosecution of the patent application, plaintiff intentionally made deliberate misstatements of fact, intended to influence the conduct of the Patent Office, this would bar enforcement whether or not the Patent Office was influenced by the alleged misrepresentations, and whether or not the patent in suit issued as a result thereof.

The alleged misstatements were those made to the Board of Appeals relating to the "dogma of the art", and to the inventions and teachings of Cox. Ultimately the major thrust of defendants' contention relates to the alleged nondisclosure or concealment of Cox '465.

Defendants refer to the brief and reply brief filed by plaintiff with the Board of Appeals [105] and quote the following positions:

1.

"COX, THE MAN SKILLED IN THE ART, FOLLOWING THE DOGMA OF THE ART, PLACED THE MALE LOCKING MEMBERS ON THE COVER AND FORMED THE PERFORATIONS OR COOPERATIVE FEMALE LATCHING MEMBERS IN THE TRAY" (p. 143.)

2.

"Cox already had the problem before Reifers' time, but Cox attempted to solve it in the manner shown in the Cox patents 2,529,140 and 2,739,750" (p. 146.)

3.

"Reifers radically departed from the dogma of the art and made the connection to the cover above the level of the tray. Cox, one of the most highly skilled men in the art, followed the practice of tying the cover to the tray at the level of the tray EVEN THOUGH COX ALREADY HAD A BRACING FLANGE (see element 48 of Cox patent 2,529,140)." (p. 147.)

4.

"The dogma of the art is to attach the male latching member to the cover, whereas applicant's latching flange is hinged to the tray so that the male latching member extends above the area where the eggs rest in their respective egg cells." (p. 150.)

5.

"Applicant's carton is the only carton in which the male latching member flange is secured to a first [the front?] side of the carton tray which is opposite to the side where the cover is hinged to the tray, which cover is formed with female latching openings." (p. 150.)

---

103. Defendants' Post Trial Brief, page 149. Emphasis in original text.

104. Ordinarily, having found validity, the next question would be infringement. In view of the way the case was presented and briefed, the court has elected to consider unenforceability before infringement.

105. Px–3.

## 6.

"The dogma of the art was presented to the Examiner in the form of:

"(1) the patent to Cox #2,529,140, which shows the cellular tray portion, the dished cover, the male latching members on the cover, and the cooperating perforations in the cellular tray as well as the bracing flap 48.

"This patent to Cox completely demonstrates that applicant's invention was unobvious to Cox, one of the most skilled men in the art.

"(2) the patent to Cox #2,739,750 which shows in a tri-fold carton of the type of the Schilling patent that the best that could be done prior to applicant's invention was to place the male latching members on the cover and the orifices 24 in the cellular tray." (pp. 170–171.)

## 7.

"The Examiner not only failed to mention the patents to Cox #2,529,140 and #2,739,750, which were specifically called to his attention, but completely ran away from this man skilled in the art * * *.

\* \* \* \* \* \*

"The work product of those skilled in the art made prior to applicant's invention must not and cannot be ignored by a fair and just tribunal." (p. 171.)

## 8.

"The Fourth Challenge Has To Do With The Examiner's Failure to Find In The Prior Art A Latchable Egg Carton Utilizing a Projection and a Perforation Wherein The Tray Portion is Imperforate."

"The Examiner has failed to meet this challenge." (p. 174.)

The Cox Patent No. 2,529,140 and Patent No. 2,739,750 showed the typical lugs on the cover and perforations in the tray. 2,529,140 also showed a bracing flange attached to the tray, and intended to be inserted behind the front wall of the cover. Here Cox had the materials for the Reifers invention—but he followed the general practice of putting the male members on the cover, and inserting them in orifices of the tray, from the outside in. Not mentioned were Cox 2,517,465; 2,637,479 and 2,655,303. In these the male members were on a flange or flap attached to the tray, the flap adapted to be on the outside of the cover when closed, and the male members intended for insertion into the cover. But the evidence is conclusive that none of these five was commercially produced, and that '465, '479 and '303 could not practically be automated [106].

■ "An inoperable invention or one which fails to achieve its intended result does not negative novelty." (Henry J. Kaiser Company v. McLouth Steel Corp., E.D.Mich.1966, 257 F.Supp. 372, 388; United States v. Adams, 1966, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572.)

Whether the term "dogma of the art" was the most apt term depends of course upon the meaning of "dogma" and "art." The art would seem to be that related to the production of molded egg cartons, not patents for molded egg cartons. In that aspect, the only commercially produced molded pulp egg cartons either had no molded locks, depending for closure upon friction, staples or glues; or had the (unsatisfactory) molded fasteners attached to the cover, for insertion into the tray from the outside in.

The Board of Appeals never once referred to the "dogma of the art." It considered the "art" relied upon by the Examiner—i. e., Koppelman and Schilling. It was impressed by the manner in which Reifers latched the cover to the tray, and the relationship of the elements as claimed.

There are other factors which lead to the conclusion that there was no intent to mislead the Board of Appeals, and that it was not in fact misled.

1. Examiner Ralston, who filed the Examiner's brief before the Board of Ap-

106. Transcript, 1149, 1245–46; 1836; 1964–65; 2103–04; 2107.

peals, was fully familiar with Cox '465, as he had been with that application from the beginning to the end. Furthermore, Cox '465 had been cited by the Examiner in the prosecution of the first Reifers application, and this file had later been examined by Ralston in order to determine the effective filing date of Reifers. Otto v. Koppers Co., 4 Cir. 1957, 246 F.2d 789, 801 is pertinent. There Circuit Judge, now Chief Judge, Haynsworth, speaking for the court said:

> "The patent in suit, however, was issued upon an application which was a continuation in part and consolidation of several prior copending applications, in one of which the Tiddy patent was cited. In the proceedings on the superseding application the Examiner (the same individual who had handled the earlier applications) was relying only upon Jeremiassen as being anticipatory, but reference was made to the earlier applications and *the claim that the Tiddy patent was not cited or considered as a relevant reference in the Patent Office cannot be sustained.* 35 U.S.C.A. § 120. See the opinion of Judge Soper in Gibbs v. Montgomery Ward & Co., D.C.Md., 19 F.2d 613, 616, affirmed 4 Cir., 27 F.2d 466." (Emphasis supplied).

2. Searches made by counsel, now counsel for defendants, either ignored Cox '465 or considered Koppelman to be the most important reference.[107]

3. Lambert in his patent application (discussed supra) represented by defendants' present attorneys, made the usual oath that he did not know that his "invention" had been patented or described in any printed publication in any country before his invention or discovery.[108]

4. Defendants in their answer to the complaint filed in the instant suit did not include Cox '465 in their citation of prior art.

■ In the foregoing discussion the court has been mindful of the principle enunciated in Denominational Envelope Co. v. Duplex Envelope Co., 4 Cir. 1935, 80 F.2d 186.[109] If the court has in fact transcended the teachings of that case, only the plaintiff could, but will not, complain, since the court finds as a fact and concludes as a matter of law that there was no conduct by plaintiff, of omission or commission in the Patent Office, that would make the Reifers patent unenforceable.

In reaching this conclusion, the court has considered, but found inapplicable the cases cited by defendants.[110]

Conduct after issuance of patent * * infringement suits.

Defendants contend that as "plaintiff with undoubted knowledge of the patent's infirmity proceeded on a vigorous and comprehensive course of action by instituting law suits on the '094 Reifers patent in four widely separated geographical areas" [111] against its four competitors (Herkimer Pulp and Packaging Corporation, Molded Container Corporation, Keyes Fibre Company and PCA), it is barred from enforcing the patent. One of these suits was settled by the defendant therein taking a license; another, by an exchange of cross-licenses;

---

107. Px–40A; Px–49.

108. Px–5.

109. The court's conclusion as to the effect of that case has been expressed in O.M.I. Corp. of America v. Kelsh Instrument Co., D.Md.1959, 173 F.Supp. 445, 458; Entron of Maryland, Inc. v. Jerrold Electronics Corp., D.Md.1961, 186 F.Supp. 483; Hanks v. Ross, D.Md.1961, 200 F. Supp. 605; and Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., D.Md.1963, 218 F.Supp. 1. See also S. H. Kress & Co. v. Aghnides, 4 Cir. 1957, 246 F.2d 718, 724.

110. Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Shawkee Mfg. Co. v. Hartford-Empire Co., 1944, 322 U.S. 271, 64 S.Ct. 1014, 88 L.Ed. 1269; Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381; and Kingsland v. Dorsey, 1949, 338 U.S. 318, 70 S.Ct. 123, 94 L.Ed. 123.

111. Defendants' Post Trial Brief, page 84.

a third has not come to trial; and the fourth is this suit.

Since the court has found there is no infirmity in the patent arising out of the Patent Office proceedings, plaintiff was and is entitled to sue any one who in good faith is believed to be an infringer. This truism was fully recognized by counsel for PCA before the existence of fraud had occurred to them. In 1961, when PCA was considering taking a license from plaintiff, counsel for PCA (and one of its present counsel) advised PCA that there appeared to be a "strong case of infringement of the Reifers patent by" cartons manufactured by Molded and Herkimer, and recommended that in any license between PCA and Diamond "the latter agree to undertake the necessary action to prevent continued infringement by Molded Container Corporation and Herkimer Pulp and Packaging Corporation." [112]

Attempt to monopolize a part of trade and commerce in egg cartons.

Defendants' position is stated as follows: [113]

"Plaintiff, By Fraudulently Obtaining Its Patent and Asserting It, All With The Specific Intent To Obtain Power Thereby to Exclude Competitors, Was Guilty Of An Attempt To Monopolize A Part Of Trade And Commerce In Egg Cartons Violative of Section 2 Of The Sherman Act"

Defendants cite Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 1965, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247. There the court said (pages 177 and 178, 86 S.Ct. pages 350 and 351):

"Walker's counterclaim alleged that Food Machinery obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office. Proof of this assertion would be sufficient to strip Food Machinery of its exemption from the antitrust laws.[5]

"5. This conclusion applies with equal force to an assignee who maintains and enforces the patent with knowledge of the patent's infirmity."

By the same token, Food Machinery's good faith would furnish a complete defense. This includes an honest mistake as to the effect of prior installation upon patentability—so called 'technical fraud.'

"To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition. It may be that the device—knee-action swing diffusers—used in sewage treatment systems does not comprise a relevant market. There may be effective substitutes for the device which do not infringe the patent. This is a matter of proof, as is the amount of damages suffered by Walker.

"As respondent points out, Walker has not clearly articulated its claim. It appears to be based on a concept of per se illegality under § 2 of the Sherman Act. But in these circumstances, the issue is premature. As the Court summarized in White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the area of per se illegality is carefully limited. We are reluctant to extend it on the bare pleadings and absent examination of market effect and economic consequences."

The Court clearly states that for the defense to be available to an infringer, the patent must have been "obtained" [114]

112. Px–48; Transcript, 2323.
  This is not cited as constituting as estoppel to assert a defense of unenforceability in this case, but simply as a recognition of the right of a bona fide patentee to sue apparent infringers.

113. Defendants' Post Trial Brief, page 84.

114. Whether the court in using the word 'obtained" intended the sine qua non rule to be applied is not clear.

by knowingly and willfully misrepresenting facts to the Patent Office and that "good faith", including "an honest mistake" would not be sufficient. If this court is correct in its conclusion that there was no fraud on the Patent Office, the patent is enforceable. But as so much time, labor and paper have been devoted to this question, especially by defendant, this court will, as briefly as possible, consider "the exclusionary power" of the patent "in terms of the relevant market for the product involved."

Defendants vehemently contend that the language immediately above quoted "did not mean, for a mere attempt, that an 'exclusionary power' in a 'relevant market' must *actually be found*. If the latter, however, must be taken as its true meaning, we submit that was not only *dictum*, but an inadvertent *dictum*."[115]

Defendants contend that there must have been an inadvertent dictum because of the (asserted) distinction between a completed monopolization in which the mere possession of exclusionary power in the relevant market is all that is necessary (with which position plaintiff agrees); and an attempt to monopolize, in which case defendants contend there need be only a specific intent to acquire exclusionary power over any substantial part of interstate commerce, not necessarily of any "relevant market"; and a dangerous likelihood of success. Plaintiff insists that the attempt must be with respect to a relevant market.

Defendants contend their position is entrenched in the law by decision after decision of the Supreme Court of the United States.

Defendants further contend that plaintiff did acquire "exclusionary power over the relevant distinct market for molded pulp egg cartons throughout the United States * * * * " [116]

In support of their contention that in attempt cases the relevant market is not to be considered, defendants cite thirteen decisions of the Supreme Court. Of these, five [117] dealt with conspiracies to monopolize (in which it is sufficient if their be a conspiracy to monopolize "any part "of interstate or foreign commerce) ; one [118] is cited for the dissenting opinion ; one was a price fixing case under section 1 of the Sherman Act [119] and three were monopolization cases.[120]

Of the attempt cases:

In Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 1934, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356, the court held that it was not necessary to prove that defendants imposed a restraint that affected all commercial advertisements in all farm papers wherever published or circulated, since the provisions of sections 1 and 2 of the Sherman Act "have both a geographical and distributive significance"; and that control of 44.37 to 66.92 per centum of the total "in the territory properly to be taken into account" (278–279) would be sufficient to make a directed verdict for the defendants improper.

115. Defendants' Post Trial Brief, page 115. Emphasis in original.

116. Defendants' Post Trial Brief, page 118.

117. Swift & Co. v. United States, 1905, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777.

118. Hyde v. United States, 1912, 225 U.S. 347, 387–388, 32 S.Ct. 793, 56 L.Ed. 1114.

119. United States v. Socony-Vacuum Oil Company, 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

120. United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264; Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 1965, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247.

The "relevant market" was determined and appraised.

United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, and Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, each charged a combination or contract under section 1 of the Sherman Act and also alleged attempts to monopolize under section 2. The relevant market was examined under the section 1 charges, which charges the court found were not sustained. The court then inquired separately into the attempt charges, and found failure to establish a specific intent. This made it unnecessary to inquire into the "market" as to which the unproved attempt related.

In Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, the defendant newspaper sought to eliminate a competing radio station from the mass communications advertising market in an Ohio locality. The court considered the nature of the market in which defendant competed, the availability of substitutes, and the relative market position of defendant; and held that there was a dangerous probability that defendant would succeed in its attempt to regain its previously possessed monopoly.

Defendants also heavily rely upon "Antitrust Policy and The Cellophane Case" 70 Harv.L.Rev. 281 by Professor Donald F. Turner. He lumps attempts and conspiracies as such "egregious" conduct that any refined concept of market should be discarded and that each of these may be condemned per se. A somewhat similar approach is taken in an article in 25 George Washington Law Review 568 (1956).

On the other hand, in another article in 27 Georgetown Law Review 227 (1958) a directly contrary view is taken. The author asserts that in attempt cases there must be a relevant market as broad as that for a monopolization charge, other-wise one could be punished for striving unsuccessfully for what, if accomplished, would be a legitimate goal, not a substantive offense. To the same effect is the paper presented at a subcommittee meeting of the Anti-Trust Section of the American Bar Association, 34 Antitrust Law Journal, 165–177. See also, Report of the Attorney General's Committee to Study the Antitrust Laws, 47 (1955).

Kellogg Co. v. National Biscuit Co., 2 Cir. 1934, 71 F.2d 662, cited by defendants, held that on motion to dismiss, allegations as to the institution of a suit to enforce an invalid trademark, and false representations as to the quality of a competitor's product, would if proved be sufficient.

United States v. Consolidated Laundries Corporation, 2 Cir. 1961, 291 F.2d 563 was a charge of conspiracy to monopolize, not monopolization, or an attempt to monopolize.

Lessig v. Tidewater Oil Company, 9 Cir. 1964, 327 F.2d 459, is the only case cited by defendants that directly holds that in an attempt (which the majority equated with conspiracy) no question of relevant market is involved. The main thrust of the 2–1 majority opinion was directed toward resale price maintenance, and exclusive dealing and tying arrangements. One page of the twelve page majority opinion deals in Part III with attempt to monopolize. The majority's concern over what it said in this connection is evidenced by its per curiam, following the dissent, in which after denying a petition for rehearing and motion of amicae curiae for leave to file a statement in support thereof, it is said:

> "The earnestness with which Tidewater suggests that Part III of the opinion may be read as rendering illegal any competitive effort to gain a share of available business leads us to add what might seem obvious: that Part III of the opinion is to be read with the remainder, and in the light of the anti-competitive purposes and con-

duct to which the case relates." 327 F.2d at 478.[121]

Different results were reached in the following district court cases:

American Football League v. National Football League, D.Md.1962, 205 F.Supp. 60; aff'd 4 Cir. 1963, 323 F.2d 124.[122] Chief Judge Thomsen apparently equated an attempt to monopolize with a combination or conspiracy to monopolize, but held that in either event such conduct required the consideration of the relevant market to which the alleged conduct was directed. He said (205 F.Supp. 64–65):

"(b)–(c). *Attempt and Conspiracy.* There may be an attempt to monopolize, or a combination or conspiracy to monopolize, without the offender or offenders actually having monopoly power. But an essential element of an attempt to monopolize, or of a combination or conspiracy to monopolize, is a specific intent to destroy competition or build monopoly. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416 at 432; American Tobacco Co. v. United States, 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575. Neither rough competition nor unethical business conduct is sufficient. The requisite intent to monopolize must be present and predominant.

"The intent must be to gain control over some relevant market sufficient to set prices in that market or to exclude competitors therefrom. An intent to exclude competitors from only part of the relevant market would not be sufficient to create liability for an attempt or a conspiracy, unless as plaintiffs contend in this case, defendants believed that by excluding the AFL from certain cities, e. g. Dallas and Minneapolis-St. Paul, they could effectively exclude it from the entire market, and acted with that specific intent as their preponderant motive."

### *"Relevant Market"*

"The market which must be studied to determine whether a business organization has monopoly power will vary with the part of commerce under consideration. United States v. E. I. du Pont de Nemours & Co., 351 U.S. at 404, 76 S.Ct. 994, 100 L.Ed. 1264; International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 249–251, 79 S.Ct. 245, 3 L.Ed.2d 270."

In United States v. Chas. Pfizer & Co., Inc., E.D.N.Y.1965, 245 F.Supp. 737, the court refused to follow Lessig v. Tidewater Oil Co., 9 Cir. 1964, 327 F.2d 459; criticized the article by Turner, "Anti-Trust Policy and the Cellophane Case", 70 Harv.L.Rev. 281, 294; distinguished between attempt to monopolize and conspiracy to monopolize (245 F.Supp. at 738–739), and concluded that "proof of the relevant market * * * was necessary to the Government's claim of attempted monopolization * * *" (245 F.Supp. at 739).

In Becker v. Safelite Glass Corporation, D.Kansas 1965, 244 F.Supp. 625, in granting summary judgment on a charge of attempt to monopolize, the court thoroughly analyzed (244 F.Supp. 637–638) Lessig, supra, and held that in attempt cases, the "relevant market" is an issue. (244 F.Supp. at 637.)

It seems to this court clear, both on authority and logic, that when a charge is

---

121. The necessity to state what "might seem to be," but apparently was not, "obvious" indicates that the conclusion that no question of relevant market is involved in attempt cases is not a flat, or all-embracive, conclusion.

122. The Court of Appeals considered separately, charges of monopoly, attempt to monopolize, and conspiracy to monopolize. On the first, the Court of Appeals approved the District Court's approach to and determination of the "relevant market." (323 F.2d at 128–131). The Court of Appeals then considered the charge of attempt to monopolize (323 F. 2d at 131–132) concluding, without specific use of the words "relevant market", that " * * * the District Court's finding is abundantly supported by the evidence * * *"

made of attempt to monopolize, the first question would be—"to monopolize what?" The answer would seem to be "the relevant market,[123] toward the monopolization of which the attempt was directed." Were this not so, there would be the anomaly that a defendant could be punished for attempting to do what, if accomplished, would be legal. That is, if a defendant in fact acquired a position in a relevant market that did not amount to monopoly, how could it be wrongful for a defendant to attempt; successfully or unsuccessfully to acquire that position —i. e., to try to do that which if accomplished would be valid?

### The Relevant Market.

Defendants' position is that if relevant market is to be considered, such "relevant markets" are "the national and western area territorial markets for molded pulp egg cartons alone * * * "[124] Plaintiff contends that the relevant geographic market is the United States, and that the relevant product market is egg cartons, including both molded and paperboard types.[125] The court agrees with the plaintiff's position as opposed to that of defendants, but suggests that perhaps "commodities reasonably interchangeable by consumers for the same purposes" [126] would include all types of egg cartons, but possibly subdivided into molded pulp egg cartons with the Reifers lock; all other molded pulp egg cartons; paperboard cartons; and all other egg cartons.[127]

The decided cases give no real help for an a priori determination of interchangeability. United States v. E. I.

du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, held cellophane competitive and interchangeable with other flexible wrapping materials, although having advantages over them. United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, held that the market for first run pictures, with a guaranteed interval before the picture could again be exhibited in the same area, was distinct from the market in second and subsequent runs, just as it was held in International Boxing Club v. United States, 1959, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270, that the "market" for championship boxing contests was different from that for all other boxing contests. United States v. Grinnell Corp., 1966, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, held that insurance company—accredited central station protective services differed from other protective services not only in utility, efficiency, reliability, responsiveness and continuity, but that insurance rates were lower for properties protected by accredited services, and that nonaccredited central stations were generally regarded as inferior.

The court finds that in this case the relevant product market is egg cartons. As hereinbefore mentioned, molded pulp cartons and paperboard cartons have their respective advantages and disadvantages—but they are functionally interchangeable, and are strongly competitive. While molded pulp egg cartons had been on the market for more than twenty-five years, at the time of trial they had acquired not quite one-half of

123. This discussion relates solely to attempts to monopolize. Whether the same principles would be applicable to combinations or conspiracies to monopolize, need not here be decided.

124. Defendants' Post-Trial Brief, page 138.

125. Citing Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), page 45.

126. United States v. E. I. du Pont de Nemours Co., 1956, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264.

127. Patent No. 3,289,911 (Px–72) to PCA, assignee of Boyd and Thaldorf, for a "Carton Construction" shows an illustrated embodiment of "molded paper-pulp", but states that "any of the illustrated cartons may be formed of thermo formed or molded plastic, press formed paperboard or any other suitable material * * * " (Col. 2, lines 62–63).

the market.[128] The same purchasers buy both kinds. A. & P.'s purchases are 50–60 per cent paperboard [129]; Safeway Stores 40–50 per cent [130] and Swift & Company somewhat under 50 per cent.[131] In fact several substantial customers of plaintiff had such unsatisfactory experiences with molded pulp egg cartons with the tab-lock that they went back to paperboard.[132]

The court further finds that, as all egg cartons are. in direct competition, and egg cartons are in use throughout the United States, the relevant geographic market is the United States. Plaintiff has at least 23 competitors[133] selling or capable of selling nationwide. Plaintiff's percentage of the molded pulp and cardboard egg cartons in the so-called eleven-state Western area is high, but vulnerable to competition; but there is no reason to treat this as a special or separate area[134] and any other eleven-state area could be taken with different results. '

Defendants' contention that the Reifers patent was fraudulently obtained to create or perpetuate a monopoly is of course inconsistent with the claim that the commercial success is not due to the Reifers lock. While the court has found this to be incorrect, if it were correct, the success must then be related to molded cartons per se. But there are a number of patents, including the Cox '465 so highly touted in connection with the Patent Office proceedings, now in the public domain.[135]

In 1966, the last year for which figures are available, plaintiff sold 51.15 per cent of the egg cartons sold in the United States. This represents a decline from 1959 of 52.29 per cent and from 1960 of 52.23 per cent. The 1966 figure of 51.15 per cent involves an increase in the sale of molded pulp egg cartons by plaintiff, but at the expense of its sale of paperboard cartons.[136] The court finds that even if there were an attempt by plaintiff to monopolize the egg carton market, there is no dangerous likelihood of success.

■ The court finds as a fact, and concludes as a matter of law, that Reif-

128. 49.6%—Dx–135.

129. Transcript, 974–981.

130. Transcript, 981–987.

131. Transcript, 988–989.

132. Transcript, 771–773, 828, 882, 1005, 1006, 1021, 1025, 1026.

133. Dx–211.

134. Defendants have referred to infringement proceedings brought by plaintiff against Molded Container Corporation, and the settlement thereof, with Molded taking a license. Defendants stress the provision under which Molded is given a non-exclusive, non-transferable license under the Reifers '094 patent to manufacture, use and sell in the United States 3 x 4 egg cartons, and cartons holding more than one dozen eggs, but which restricts the right to manufacture, use and sell 2 x 6 cartons to *"thirteen* Western States" (emphasis supplied), asserting that the 2 x 6 market was expanding. However, the licensing agreement (Px–144), contains a most-favored nation clause; and there is no contention that plaintiff's other licenses are restricted as to the manufacture, use and sale of 2 x 6 cartons.

135. 1,690,492  Koppelman and Mapes
    1,846,561  Koppelman
    1,975,128  Sherman
    1,970,145  Swift
    2,061,064  DeReamer
    2,061,065  DeReamer
    2,093,280  Koppelman
    2,423,756  Chaplin
    2,466,579  Cox
    2,517,465  Cox
Defendants in their Reply Brief, page 69, state that plaintiff has contended (and defendants apparently agree) that these were "paper patents", "still-born", "impractical" and "failures." It is hard for defendants so to contend, and still deprecate the Reifers lock.
Plaintiff's Reply Brief to defendants' Main Brief on Validity, page 224, in a footnote states:
"Subsequent to the conclusion of the trial, plaintiff has learned that Continental Can Company, a company with annual sales in excess of $1.3 billion is manufacturing and selling a carton like that shown in Cox 2,466,579 * * * "
This statement is not challenged by defendants in their reply brief.

136. Px–150.

ers '094 is not unenforceable for violation by its owner of the antitrust laws.

## Infringement

It is conceded that the flat top molded pulp egg cartons produced by PCA between June 27, 1961 (the date on which the Reifers '094 patent issued) and April 1963, when their production was discontinued, infringe Claim 1 of the Reifers '094 patent, if that patent is valid.

Thereafter PCA manufactured molded pulp egg cartons of the 3 x 4 and 2 x 6 type. Although these cartons appear to have "identity of means, operation and result" [137] with those set forth in the Reifers claims, defendants insist that certain physical differences in their cartons from the best mode set forth in the Reifers specifications avoid infringement.

These relate to the location in the accused devices of:

1. the apertures in the front wall of the cover, which do not extend up to the top panel of the cover;

2. the buttons or lugs, in their relationship to the tops of the eggs when the flap has been rotated upwardly and inwardly in the closing of the carton;

3. the top edge of the flange, which is below the tops of the accommodated eggs;

4. the buttons or lugs in front of certain eggs comprising the front row of eggs; and

5. the presence of a V-groove or rib in the cover, extending from front to rear.

Plaintiff to some extent questions the accuracy of the above factual assertions; and contends that these alleged variations are in fact covered by the claims in suit, either by specific language, or by the doctrine of equivalents. Although this combination patent is in a closely crowded art, and is not a pioneering breakthrough, it is of substantial importance in the field of egg cartons, especially molded pulp egg cartons, constituting "a valuable contribution to the art," entitling the patent "to liberal treatment." [138]

Defendants' approach to the five factors mentioned above is the highly technical one that since the specification details one physically structured carton, and *arguments* in the File Wrapper emphasize certain physical features, the plaintiff is limited to the exact structure described in the specification, without regard to equivalence and despite the fact that the claims do not call for the specific structure. Indicative of this approach is the contention that the language: "The foregoing statements are indicative in a general way of the invention" [139] is limiting, or restrictive. Defendants emphasize that "not until the next paragraph in column 3 of the patent does Reifers refer to 'a single embodiment of the invention'" [140], and contend that all that precedes these quotations must therefore be the "only", and not the "best mode." [141]

**137.** Scherbatskoy v. United States Steel Corporation, 7 Cir. 1961, 287 F.2d 552, 558.

**138.** Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir. 1936, 80 F.2d 912, 921; Denominational Envelope Company v. Duplex Envelope Co., Inc., 4 Cir. 1935, 80 F.2d 186, 187, 193. See also Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

**139.** Column 3, lines 50–51.

**140.** Defendants' Reply Brief on the Issue of Infringement, page 4. See also Reifers '094, column 7, lines 63–68.

**141.** Interestingly enough, PCA's present counsel, in the preparation of the specifications in Patent No. 3,184,133 to Boyd and Allen, assignors to PCA (Px–6–0) do not use the magic words "best mode"; and it is in the last paragraph of the specification that it is stated that "the present disclosure has been made only by way of example * * *" See also Patent No. 3,289,911 to Boyd and Thaldorf, assignors to PCA (Px–72 Column 6, lines 9–13.—Et tu Brute?)

The court concludes that the specification in Reifers '094 was intended to disclose an invention with respect to locking a molded pulp egg carton; and that the description of the particular carton was intended to show the best mode, and not the only, or exclusive, mode of carrying out the invention.

Claims "must be interpreted not literally in vacuo, but rather in the light of the specifications" [142], but "the specifications, unless so declared, are only an example of what the claim is intended to cover; it is a species of a broader genus, else no claims would cover anything not literally described in the specifications." [143]

Considering now the five structural elements relied upon by defendants to avoid infringement:

1. In the specification, the locking apertures are described as "adjacent" the top of the cover.[144] This results in maximum free movement between the lugs and eggs, and also is advantageous in molding and stripping.

Drawings for defendants' cartons beginning in 1963 initially called for holes below the top of the front wall of the cover, but these were changed, and cartons were manufactured in which the holes in the front wall of the cover extended to the very top. Later the holes were lowered to their present location, in which a substantial closed area extends between the top of the hole and the top of the front wall of the cover.[145] This admittedly was in an effort to avoid infringement [146] (presumably of Claim 2) and probably for this reason only, as the evidence is uncontradicted that from a manufacturing standpoint the hole extending to the top is preferable.[147] Visual observations of plaintiff's and defendants' product showed that the hole extending to the top presents a much neater appearance.

Apart from the questions of equivalence, and an inferior use of an invention, to be considered after dealing with defendants' five grounds of alleged distinction, the location of the locking apertures in defendants' cartons would still be an infringement of Claim 1, which is not limited to any particular relationship between the apertures and the top of the front wall of the cover. This is pointed up by Claim 2, reading:

"2. A nestable molded pulp egg carton in accordance with claim 1, wherein the opening in the front side wall of said cover extends to the planar portion thereof and the latch on said latching flap is near the edge thereof which is remote from the hinge connection of the latching flap with the tray portion."

If Claim 1 covered the subject matter of Claim 2, Claim 2 of course would and could not have been allowed.

2. As discussed under the first point, the specification recites an advantage of the suggested location of the apertures and lugs to be that by being in a zone "fartherest spaced from the maximum curvature of eggs in cells at either side thereof * * * there is a maximum free movement arm between each lug and adjacent egg, so that the lugs are disengaged with ease and convenience from the cover apertures in opening the carton." [148]

Defendants contend that in their cartons there is no substantial top space into which the flange may readily move for unlocking.

142. Wheeling Stamping Co. v. Standard Cap & Molding Co., 4 Cir. 1946, 155 F.2d 6, 8.

143. Reiner v. I. Leon Co., Inc., 2 Cir. 1960, 285 F.2d 501, 504.

144. Column 2, lines 31–33; 40–50.
Defendants' argument seems to be that this means "at" and not "adjacent." In the court's view, it is not necessary to decide what variance could be encompassed in "adjacent."

145. Px–19A; Px–19B.

146. Px–174, page 41.

147. Transcript, 583, 584; 1435–36; 1564; 1640; 1768; 1934, 1935.

148. Column 2, lines 32–39.

The accuracy of this statement is dependent in part upon the size of the contained eggs. With respect to pullet eggs, the statement is inaccurate; .with respect to jumbos, the statement may be correct; [149] but the eggs may be so large as to prevent closing the carton, in which case, of course, there is no problem of opening. Clearly the mode described in the Reifer specifications is preferable to one which subjects the eggs to unnecessary pressure; but the Reifers claims are not limited to the precise structure described in the specifications and are sufficiently broad as to cover in this respect the accused cartons.

3. In support of contention 3 that Reifers '094 calls for the top edge of the flange to be above the tops of the accommodated eggs (which is an almost inevitable corollary of contention 2) defendants quote from Column 2, lines 34–36 of the patent. Probably they also meant to refer to Column 6, lines 11–18, where reference is made to the flange being "in edge abutting, load sustaining relation to cover top panel * * *"

While of course testimony by an inventor in an infringement suit as to what his intentions were cannot be permitted to alter plain language, such testimony does show that while the preferred form would have the flange abutting the cover,[150] this was not essential to the true concept of the structure.[151]

Clearly an abutting flange would strengthen the carton, but there is nothing in either claim requiring this to be the case.

4. Defendants contend that the Reifers specification discloses a structure with the lug (or lugs) positioned between the front row egg cells, while in the accused cartons "the vertical planes of the lugs are aligned with the eggs, and therefore the eggs are subjected to the very crushing danger which Reifers says in substance must at all costs be avoided." [152]

Several comments are in order. In actual construction, the lugs in the accused cartons are *partially*, not directly, aligned with the eggs. Secondly, it is inconceivable that defendants would market, or want to market, a carton so constructed that the eggs are perpetually and deliberately subjected to crushin danger (in packing, closing, shipping, and opening). Third, Reifers does not take an "at all costs" approach, but points out that the preferred structure relieves the eggs of "wedging or crushing." [153]

Defendants also point out that Reifers states[154] that the eggs have no function in respect to the making or maintenance of the interlock between the flange lugs and cover apertures; and that the lock is equally effective whether the carton is empty or wholly or partially filled.

Defendants' cartons lock satisfactorily when empty, or wholly or partially filled. No evidence was offered that the lock was not satisfactorily maintained when a carton was only partially filled.[155]

While of course not determinative, it is significant that PCA regarded the placement of the lugs between the cells and over the cells as equivalents. In

---

149. Dx–11; Px–157.

The average size of eggs has increased since Reifers time, and what were then considered large eggs are now medium size eggs. Transcript, 1863–1864; Px–153, page 6. [No testimony was offered as to whether, and if so how far, Russian hen eggs surpass American hen eggs.]

150. Transcript, 1730.

151. Transcript, 1781.

152. Defendants' Reply Brief on the Issue of Infringement, page 7.

153. Column 2, lines 10–14.

154. Column 2, lines 6–14, 21–30.

155. That is, with no eggs in the front row, or no eggs adjacent a lug or lugs. Either of these situations is likely to occur in use by a small family where only a few eggs are removed at a time. If the practice were to empty and discard the carton, staples would be an entirely satisfactory lock.

Lambert application Serial No. 512,-005 [156], in which a 3 x 4 carton is illustrated, the specification calls for a single button shown on the drawing to be centrally located (between cells 2 and 3) or two buttons (one over the part of cell 2 nearest to cell 1, and the other over the part of cell 2 nearest cell 4) as shown on the drawings.

The claims in said Lambert application refer to "at least one" locking member, and are silent as to where it or they are to be located with respect to the egg cells.

Further, in connection with possible infringement proceedings by Diamond against Molded Container Corporation and Herkimer, heretofore mentioned, the Molded Container Corporation 3 x 4 carton[157] had a two-button lock with the buttons located above the second and third cells of the front row of four cells. The Herkimer 3 x 4 carton[158] had a single button lock between the two center cells of the front row of four cells.

These two cartons were then—ante litem motam—considered by PCA's counsel as functioning in substantially the same manner, and that the Reifers '094 patent would read on the latching flap structures of each of the cartons.[159]

Moreover, the claims of the Reifers patent do not require the lug or lugs to be located in any particular relationship to the cells; although between the cells is obviously the better location.

5. Finally, defendants contend that the construction of their cartons with a V-groove or ridge in the cover, extending from front to rear, prevents infringement because of the language of Claim 1 calling for a carton with an "inverted dished cover, having a planar top, a front side, a rear side, and two ends, said front side being connected to said rear side only by said two ends and said planar top so that the front side is relatively flexible and is not rigidly tied to said rear side intermediate the ends of said front side * * * " [160]

There are a number of considerations some of which, considered singly, and all jointly, require a conclusion adverse to defendants' position.

Of course an egg carton could not literally have a planar top and function as an egg carton. As the Court said in Methode Electronics, Inc. v. Elco Corporation, 3 Cir. 1967, 385 F.2d 138, 141, if the word "plane * * * were limited to its strict geometric sense * * * a plane in this sense has no depth and is only two dimensional." It is clear from the art, the file wrapper, and the patent itself [161] that the "planar top" was intended to be contrasted with a cellular top (such as Koppelman '280); and that the requirement that the front side be connected to the rear side only by the two ends was "so that the front side is relatively flexible and is not rigidly tied to said rear side intermediate the ends of said front side * * * " [162]

If the word "only" were given a literal construction, then any thickening between the front and rear sides—a band one millimeter wide and one millimeter thick—would avoid infringement. Ob-

156. Px–5; abandoned on the basis of Diamond's Shellmar Australian patent.

157. Px–48A.

158. Px–48B.

159. Px–48.

160. Column 8, lines 11–16.
   Defendants also argue file wrapper estoppel. To the court it is clear that the arguments of counsel, and the decision of the Board of Appeals (Px–3, page 180) with respect to the cover related only to the non-cellular character of the top, as distinguished from the bottom of Koppel-man '280. (Although the top and bottom of Koppelman were cellular, the Examiner had proposed an inversion of Koppelman). The insertion of the language in question was not required by the Examiner; he refused to allow claim 23 as amended and was reversed.
   The court finds no element of file wrapper estoppel.

161. "Non-cellular". Column 1, line 21; Column 4, line 16; Column 6, line 50.

162. Column 8, lines 12–16, emphasis supplied.

viously no court would so construe the word even if the "so that" explanation or qualification did not appear. With the "so that", it is unmistakeably clear that the purpose is to prevent connections between the front and rear sides which would so rigidly tie them that the front side would not be "relatively flexible."

Cox Patent No. 2,529,140 [163] illustrates a dished cover with a flat top, and the same top with a V-groove. In comparing the two, they are said to be the same as in the "non-divisible carton" except for the dividing groove.[164]

Cox Patent No. 2,455,295 [165] discloses a similar V-groove. In the patent to Boyd and Allen, assignors to PCA, Patent No. 3,184,133 [166], illustrating an accused V-groove carton, it is stated: [167]

"The cover 14 includes a *pair* of *coplanar* sections 40 and 42 which cooperate to form the top surface of the cover."

Boyd's testimony on deposition is striking. He admitted that obviously there was some flexing of the front wall of the carton when it was cammed over the buttons; and that the greater the distance the cover extended below the tie, the greater the flexibility. Because of this in the later accused devices of the defendants the distance below the V-groove has been increased, for greater flexibility.[168]

In another patent to Boyd and Thaldorf, assignors to PCA, Patent No. 3,-289,911 [169] the carton 20 is described as comprising "an open top tray 21 having a cellular bottom 22".[170] The drawings and specifications call for a stiffening rib in the top. As to this, and the absence of necessity for it, the specification says:[171]

"To provide added stiffness to the cover top surface 31, so as to resist warping or deforming of the cover when subject to a bearing load, an elongated rectilinear reinforcing rib 38 is formed therein which rigidly interconnects the back wall 34 and front wall 32. The rib is centrally disposed between cover end walls 33 and 35 and depends from top surface 31 an amount less than the extent to which the walls depend therefrom. Other ways of providing added stiffness for the cover may be utilized, if desired, or *in some instances the rib or other stiffening means may be eliminated completely.* The rib or stiffening means per se forms no part of the instant invention." (Emphasis supplied).

Whether the purpose of the rib is to add strength, or to try to avoid infringement is not clear. As will shortly be discussed, even if it is an improvement, that may well be the basis for a patent on the improvement, but would not necessarily avoid infringement if the patentable features of Reifers '094 are used without a license.

There is real question as to whether the V-groove does add strength to the carton.[172]

After May 13, 1963, PCA discontinued the manufacture of the flat top carton and began the manufacture of a 3 x 4 V-grooved carton.[173] However, at least as late as the March 1964 issue of "Poultry Processing and Marketing" magazine [174] PCA was still advertising the flat top carton as providing the "finest protection", but was filling orders with the V-

---

163. Px–64.

164. Column 6, lines 1–4.

165. Px–40A.

166. Px–6–O.

167. Column 3, lines 26–28. Emphasis added.

168. Compare the later cartons, Px–9A, Px–164, Px–170 with the earlier; Px–78, Px–170.

169. Px–72.

170. Column 2, lines 71–72.

171. Column 3, lines 27–40.

172. Transcript 26; Allen deposition, Px–177, page 16.

173. Pretrial Order, paragraph 7.

174. Px–160.

584

groove carton.[175]  This is either an unequivocal admission of equivalency, or unscrupulous dealing with customers.[176]

In the accused cartons the front side is not so rigidly tied to the rear side as to keep the front side from being relatively flexible.  The V-groove or rib does not avoid infringement.

■■  The five purported differences alleged by defendants between the accused devices and what they wish to read into the claims may represent, in the case of the V-groove, an improvement, or with respect to the size of the flange and the location of the latching lugs, a less satisfactory or inferior structure.  The accused devices [177] are of a construction substantially the same as that claimed in Reifers '094; operate in substantially the same way;  and produce substantially the same results.  Therefore there is infringement.  Supplementation or modification, even if an improvement will not avoid infringement;  nor will an impairment.  Ransburg Electro-Coating Corp. v. Proctor Electric Co., D.Md.1962, 203 F.Supp. 235, 258, and cases cited therein, aff'd 4 Cir. 1963, 317 F.2d 302; Marston v. J. C. Penney Co., Inc., 4 Cir. 1965, 353 F.2d 976;  Matthews v. Allen, 4 Cir. 1950, 182 F.2d 824, 827–828.

Plaintiff has charged that the infringement has been wilful, and asks for appropriate penalties.  While the validity of the Reifers '094 patent, and the infringement thereof, appear to the court to be clear, the court is not prepared to say that defendants may not in good faith have believed that the structural changes they initiated to avoid infringement were probably sufficient.  The court is therefore unwilling to find that the infringement was wilful.

Reifers Patent 2,990,094 is valid, infringed, and may be enforced against the defendants.

The defendants' counterclaims are dismissed.

The foregoing opinion embodies the court's findings of fact and conclusions of law under Rule 52, F.R.Civ.P.

The parties are hereby directed to submit an appropriate decree.  They are also to endeavor to agree upon an accounting.

---

175.  Transcript, 2208–2209.

176.  PCA has not stated which interpretation it prefers the court to take.

177.  The court has not dealt with the announced cartons.  They have not been put on the market and the court will not give advisory opinions.